UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SELIM ZHERKA,

                    Plaintiff,                                No. 08 Civ. 2062 (CLB)(GAY)

           - against -

MICHAEL F. BOGDANOS, individually, MICHAEL R.
EDELMAN, individually a/k/a "THE CONSULTANT,"
PHILIP AMICONE, individually and in his capacity as
Mayor of the City of Yonkers, New York; DAVID "DOE"
a/k/a "ETHAN EDWARDS," individually, EDMUND
ROE a/k/a "MOB BUSTER," individually, et al.,

                    Defendants.

---

**MEMORANDUM OF LAW OF NONPARTY WITNESS
GANNETT SATELLITE INFORMATION NETWORK, INC., IN SUPPORT
OF ITS MOTION TO QUASH OR MODIFY SUBPOENAS DUCES TECUM**


SATTERLEE STEPHENS BURKE & BURKE LLP

Mark A. Fowler (MF-4605)
Glenn C. Edwards (GE-0696)
Attorneys for Nonparty
      Gannett Satellite Information Network, Inc.
230 Park Avenue, Suite 1130
New York, NY  10169
(212) 818-9200

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......................................................................................................... ii

PRELIMINARY STATEMENT .................................................................................................... 1

BACKGROUND .......................................................................................................................... 2

ARGUMENT

    THE POSTERS' FIRST AMENDMENT RIGHT TO SPEAK ANONYMOUSLY
    PRECLUDES ENFORCEMENT OF THE SUBPOENAS .................................................. 3

    1.    Plaintiff Has Failed to Provide Adequate Notification to the Posters .................. 10

    2.    Plaintiff Must Identify the Exact Statements in Question – in Context ............... 11

    3.    Plaintiff Has an Alternative Means of Obtaining the Information ....................... 11

    4.    Plaintiff Must Make a Factual Showing as to Each Element of the Claims .......... 12

CONCLUSION .......................................................................................................................... 15

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

Columbia Inc. v. SeesCandy.com,
   185 F.R.D. 573 (N.D. Cal.1999) ....................................................................................8, 9

Cusak v. 60 Minutes Div. of CBS, Inc.,
   29 Media L. Rep. 2067 (Sup. Ct. N.Y. Co. Sept. 13, 2006)..............................................13

Doe I v. Individuals,
   __ F. Supp. 2d __, 2008 WL 2428206 (D. Conn. June 13, 2008).........3, 6, 8, 9, 11, 12, 14

Highfields Capital Mgmt. L.P.,
   385 F. Supp. 2d 969 (N.D. Cal. 2005)....................................................................3, 7, 9, 12

McIntyre v. Ohio Elections Comm'n,
   514 U.S. 334 (1995) .............................................................................................................4

McMann v. Doe,
   460 F. Supp. 2d 259 (D. Mass. 2006)..................................................................................5

Reno v. American Civil Liberties Union,
   521 U.S. 844 (1997) .............................................................................................................4

Sony Music Entm't Inc. v. Does 1-40,
   326 F. Supp. 2d 556 (S.D.N.Y. 2004) .............................................................3, 5, 6, 7-8, 9,
                                        11, 12

Verizon Internet Services,
   257 F. Supp. 2d 244 (D.D.C.2003),
   rev'd on other grounds, 351 F.3d 1229 (D.C.Cir.2003)......................................................9

Vermont Right to Life Comm., Inc. v. Sorrell,
   221 F.3d 376 (2d Cir. 2000) ...............................................................................................4

Watchtower Bible & Tract Soc. v. Village of Stratton,
   536 U.S. 150 (2002) ...........................................................................................................4

## STATE CASES

600 W. 115th St. v. Von Gutfeld,
    80 N.Y.2d 130 (N.Y. 1992) ................................................................... 13

America Online, Inc.,
    52 Va. Cir. 26, 2000 WL 1210372 (Va. Cir. Ct. January 31, 2000) .................... 9

Bernard v. Grenci,
    48 A.D.3d 722, 2008 WL 526251 (2d Dep't Feb. 26, 2008) ..................... 12, 14

Dendrite Int'l v. Doe No. 3,
    775 A.2d 756 (N.J. Super. App. Div. 2001) ................................. 4, 6, 7, 8, 9, 10,
                                                                                    12, 14

Doe v. Cahill,
    884 A.2d 451 (Del. 2005) ........................................................... 4, 5, 6, 7

In re Does 1-10,
    242 S.W.3d 805 (Tex. App. - Texarkana 2007) ................................................ 5

France v. St. Clare's Hospital,
    82 A.D.2d 1, 441 N.Y.S.2d 79 (1st Dep't 1981) ............................................. 11

Greenbaum v. Google,
    845 N.Y.S.2d 695 (Sup. Ct. N.Y. County 2007) ........................................... 4, 7

Gross v. N.Y. Times,
    82 N.Y.2d 146, 603 N.Y.S.2d 813 (1993) ...................................................... 12

Krinsky v. Doe 6,
    72 Cal. Rptr. 3d 231, 2008 WL 315192 (Cal. App. Feb. 6, 2008) ............... 5, 6, 7, 8, 9, 12

Miness v. Alter,
    262 A.D.2d 374, 691 N.Y.S.2d 171 (2d Dep't 1999) ....................................... 12

Mobilisa, Inc. v. Doe I,
    170 P.3d 712 (Ariz. App. 2007) .................................................................... 7, 9

In re Ottinger v. The Journal News,
    No. 08-03892 (Sup. Ct. Westchester Co. June 27, 2008) ..................................... 7

Tendler v. www.jewishsurvivors.blogspot.com,
    __ Cal. Rptr. 3d __, 2008 WL 2352497 (Cal. App. June 10, 2008) .................... 6

iii

**DOCKETED CASES**

Foley v. CBS Broadcasting, Inc.
        No. 169463/05 (Sup. Ct. N.Y. Co. Sept. 13, 2006) ........................................................... 13

**STATUTES**

Fed. R. Civ. P. 45(c)(2) ...................................................................................................................... 3

742441_1

Nonparty witness Gannett Satellite Information Network, Inc. ("Gannett") respectfully submits this memorandum of law in support of its motion to quash or modify three subpoenas duces tecum, dated June 27, 2008 (the "Subpoenas"), issued by counsel for plaintiff Selim Zherka in this action.

## PRELIMINARY STATEMENT

Anonymous speech has a long and valued history in this country. With the advent, even the explosion, of the internet, the opportunities for speakers to reach new audiences – and the potential value for the anonymity of those speakers – has increased exponentially. The chance for speakers to remain anonymous, or pseudonymous, has made the Internet a wide-open, robust forum for discussion and information exchange on a scale that undoubtedly our Founding Fathers could have never imagined when they wisely ensconced freedom of speech in the First Amendment.

Plaintiff Selim Zherka's Subpoenas in this case are a frontal attack on that freedom. Zherka has sought to unmask the identity of three posters to the public forums of the www.LoHud.com website maintained by The Journal News, one of Gannett's publications. The effect (should he be successful) is clear: these forums, which The Journal News instituted precisely to foster the free exchange of information and ideas, will become severely chilled if the public feels that they cannot participate in such forums without the risk of being unmasked and, perhaps, haled into court should their speech offend the wrong person. Thus, the Court should quash the subpoenas – or significantly limit them – in order to vindicate the strong First Amendment rights at stake in this matter.

## BACKGROUND

The Journal News is a daily newspaper that is widely distributed throughout Westchester, Bronx, New York, Putnam, and Rockland Counties and in surrounding areas of New York and Southern Connecticut. It is published by, and operates as a business division of, Gannett. (Affidavit of Mark Fowler ("Fowler Aff.") ¶ 2.) The Journal News operates a website, www.LoHud.com ("LoHud.com"), which contains, among other things, on-line community forums on which readers may post comments regarding news, opinion, or anything of public or community interest. (Id. ¶ 3.)

On or about June 30, 2008, counsel for plaintiff served The Journal News with three subpoenas duces tecum (the "Subpoenas") directed to "Gannett Suburban Newspapers," "The Journal News," and "LoHud.com."[1] Fowler Aff. ¶ 6 and Exh. A. Each of the Subpoenas seeks:

> each document in your possession, custody, and/or control concerning the true identities of the following bloggers who have made blog entries on Politics on the Hudson: "Mob Buster"; "Ethan Edwards." Notice of this subpoena to bloggers "Mob Buster" and "Ethan Edwards" is being posted on "Politics on the Hudson" to afford them an opportunity to move to quash.[2]

Id. Ex. A.

The Subpoenas appear to be directed at identifying potential defendants, who are sued as "John Does" in this action, and who are alleged to have posted certain statements in the

---

[1] The Journal News is a business unit of Gannett and not a separate entity, and LoHud.com is simply the name of a news and information website operated by The Journal News. There is no longer a business unit called "Gannett Suburban Newspapers." Gannett's motion is directed to all three subpoenas.

[2] Plaintiff, somewhat imprecisely, uses the term "blogger" to refer to the individuals using the pseudonymous "screen names" "Mob Buster" and "Ethan Edwards," who posted the commentary at issue. Because the statements did not appear in "blogs," but in responsive postings on certain on-line forums on LoHud.com, Gannett has used the alternative term "Posters" to refer to "Mob Buster" and "Ethan Edwards."

"Politics on the Hudson" blog site, which are set forth in paragraphs 6 through 22 of the Complaint. Plaintiff contends that the statements refer to him and are false and defamatory. However, many of the statements, as reported in the Complaint, are divorced from their original context. As a result, it is often difficult to determine from the Complaint whether, or to what extent, certain statements are actually of and concerning Mr. Zherka or whether they may qualify as protected opinion or vigorous epithet, which cannot give rise to a defamation claim.

The Subpoenas commanded production of the information by July 11, 2008.[3] In a letter to the Magistrate Judge Fox, dated July 3, 2008, The Journal News requested leave to file a motion to quash. The Journal News also served objections to the Subpoenas, pursuant to Fed. R. Civ. P. 45(c)(2), on or about July 7, 2008.

On July 21, 2008, Magistrate Judge Fox granted leave to file the present motion.

## ARGUMENT

### THE POSTERS' FIRST AMENDMENT RIGHT TO SPEAK ANONYMOUSLY PRECLUDES ENFORCEMENT OF THE SUBPOENAS

The Journal News respectfully asserts that, in light of the protection accorded to anonymous speech under the First Amendment of the United States Constitution and under Article I, Section 8, of the New York State Constitution, the subpoenas cannot be enforced unless Mr. Zherka can satisfy the stringent requirements for compelling disclosure of the identities of anonymous posters set forth in Doe I v. Individuals, __ F. Supp. 2d __, 2008 WL 2428206 (D. Conn. June 13, 2008), Highfields Capital Mgmt. L.P., 385 F. Supp. 2d 969, 974-76 (N.D. Cal. 2005), Sony Music Entm't Inc. v. Does 1-40, 326 F. Supp. 2d 556, 562 (S.D.N.Y.

---

[3] This is the second time that Mr. Zherka has sought information concerning the identity of the Posters who have used the screen names "Mob Buster" and "Ethan Edwards." In February of this year, Mr. Zherka's counsel served a series of subpoenas seeking virtually the same information in the related case of Zherka v. Amicone, 07 Civ. 9618 (S.D.N.Y) (the "Amicone Case"). The Journal News filed a motion to quash, and Mr. Zherka's counsel withdrew the subpoenas in the Amicone Case rather than having Judge Brieant rule on the motion.

742441_1

2004), <u>Dendrite Int'l v. Doe No. 3</u>, 775 A.2d 756 (N.J. Super. App. Div. 2001), <u>Doe v. Cahill</u>, 884 A.2d 451, 456 (Del. 2005), <u>Greenbaum v. Google</u>, 845 N.Y.S.2d 695, 698-99 (Sup. Ct. N.Y. County 2007), and other federal and state cases.  Gannett submits that plaintiff is unlikely to be able to make the necessary showing.

The Supreme Court has consistently defended the right to anonymous speech in a variety of contexts, noting that a speaker's "decision to remain anonymous . . . is an aspect of the freedom of speech protected by the First Amendment."  <u>McIntyre v. Ohio Elections Comm'n</u>, 514 U.S. 334, 342 (1995) ("Under our Constitution, anonymous pamphleteering is not a pernicious, fraudulent practice, but an honorable tradition of advocacy and of dissent.")[4]; <u>see also</u> <u>Watchtower Bible & Tract Soc. v. Village of Stratton</u>, 536 U.S. 150, 166-67 (2002); <u>Vermont Right to Life Comm., Inc. v. Sorrell</u>, 221 F.3d 376, 387 (2d Cir. 2000) ("anonymous communications . . . have played a central role in the development of free expression and democratic governance").  The First Amendment, including its concern for a speaker's choice to remain anonymous, is as fully applicable to speech on the Internet as it is to paper leaflets.  <u>See</u> <u>Reno v. American Civil Liberties Union</u>, 521 U.S. 844, 870 (1997) ("Through the use of chat rooms, any person with a phone line can become a town crier with a voice that resonates farther than it could from any soapbox.  Through the use of Web pages, mail exploders, and newsgroups, the same individual can become a pamphleteer. . . . [O]ur cases provide no basis for qualifying the level of First Amendment scrutiny that should be applied to this medium").

---

[4] Of particular note is the concurrence of Justice Thomas in <u>McIntyre</u>, documenting in great detail the fact that <u>anonymous</u> political pamphleteering was a core value that the Founding Fathers sought to protect in drafting the First Amendment. 514 U.S. at 1525 (Thomas, J., concurring); <u>compare</u> <u>Doe v. Cahill</u>, 884 A.2d 451, 456 (Del. 2005) ("Anonymous internet speech in blogs or chat rooms in some instances can become the modern equivalent of political pamphleteering.").

4

Indeed, "[t]he Internet is a particularly effective forum for the dissemination of anonymous speech." Sony Music Entm't Inc. v. Does 1-40, 326 F. Supp. 2d 556, 562 (S.D.N.Y. 2004). As stated earlier this year by the California Court of Appeals,

> [O]rdinary people with access to the Internet can express their views to a wide audience through the forum of the online message board. The poster's message not only is transmitted instantly to other subscribers to the message board, but potentially is passed on to an expanding network of recipients, as readers may copy, forward, or print those messages to distribute to others. The use of a pseudonymous screen name offers a safe outlet for the user to experiment with novel ideas, express unorthodox political views, or criticize corporate or individual behavior without fear of intimidation or reprisal. In addition, by concealing speakers' identities, the online forum allows individuals of any economic, political, or social status to be heard without suppression or other intervention by the media or more powerful figures in the field.

Krinsky v. Doe 6, 72 Cal. Rptr. 3d 231, 2008 WL 315192, at *4 (Cal. App. Feb. 6, 2008); see also Doe v. Cahill, 884 A.2d at 456 ("Internet speech is often anonymous. . . . This unique feature of [the Internet] promises to make public debate in cyberspace less hierarchical and discriminatory than in the real world because it disguises status indicators such as race, class and age.") (internal quotation omitted); In re Does 1-10, 242 S.W. 3d 805, 820 (Tex. App. – Texarkana 2007) (Internet anonymity "serves a particularly vital role in the exchange of ideas and robust debate on matters of public concern").

Because of these important values, efforts to use the power of the courts to pierce anonymity by subpoena implicate First Amendment concerns. Sony, 326 F. Supp. 2d at 563. Such efforts are therefore subject to a qualified privilege, which must be considered – and overcome – before permitting discovery of a defendant's identity. See McMann v. Doe, 460 F. Supp. 2d 259, 266 (D. Mass. 2006) ("Courts must adopt an appropriate standard such that aggrieved parties can obtain remedies, but cannot demand the court system unmask every insolent, disagreeable, or fiery anonymous online figure."). The right to anonymity is not

5

absolute, however; it may be pierced where necessary for a plaintiff to receive redress for legitimate and cognizable grievances for, e.g., copyright infringement or defamation. See Sony, 326 F. Supp. 2d at 562-63; Cahill, 884 A.2d at 456.

Thus, courts faced with requests to require identification of anonymous potential defendants have attempted to strike a balance between the First Amendment rights of the speaker and the legitimate needs of a potential plaintiff. See Krinsky, 2008 WL 315192, at *5. It is critical that the hurdle for such identification be set sufficiently high:

> We are concerned that setting the standard too low will chill potential posters from exercising their First Amendment right to speak anonymously. The possibility of losing anonymity in a future lawsuit could intimidate anonymous posters into self-censoring their comments or simply not commenting at all. A defamation plaintiff, particularly a public figure, obtains a very important form of relief by unmasking the identity of his anonymous critics. The revelation of identity of an anonymous speaker may subject [that speaker] to ostracism for expressing unpopular ideas, invite retaliation from those who oppose her ideas or from those whom she criticizes, or simply give unwanted exposure to her mental processes.

Cahill, 884 A.2d at 457. See also Tendler v. www.jewishsurvivors.blogspot.com, __ Cal. Rprtr. 3d __, 2008 WL 2352497 (Cal. App. June 10, 2008) (noting that some requests for subpoenas to disclose the identities of writers "will be solely for the purpose of silencing a critic by harassment, ostracism, or retaliation").

While, in the absence of Supreme Court (or, in this case, Second Circuit) guidance, there is no controlling standard for this balance, most recent cases have adopted the test enunciated in the leading case of Dendrite Int'l v. Doe No. 3, 775 A.2d 756 (N.J. Super. App. Div. 2001), or some slight variant thereof. See, e.g., Doe I v. Individuals, 2008 WL 2428206 at *4-5 (D. Conn. June 13, 2008) (expressly adopting – and adapting – the Dendrite

6

standard). <u>Dendrite</u> announced a four-step test for a court faced with a request to enforce a

subpoena requesting the identity of a potential defendant:

> 1) "[T]he trial court should first require the plaintiff to undertake efforts to notify the anonymous posters that they are the subject of a subpoena or application for an order of disclosure, and withhold action to afford the fictitiously-named defendants a reasonable opportunity to file and serve opposition to the application. These notification efforts should include posting a message of notification of the identity discovery request to the anonymous user on the ISP's pertinent message board";
>
> 2) "The court shall also require the plaintiff to identify and set forth the exact statements purportedly made by each anonymous poster that plaintiff alleges constitutes actionable speech";
>
> 3) "The complaint and all information provided to the court should be carefully reviewed to determine whether plaintiff has set forth a prima facie cause of action against the fictitiously-named defendants. In addition to establishing that its action can withstand a motion to dismiss . . . the plaintiff must produce sufficient evidence supporting each element of its cause of action, on a prima facie basis"; and
>
> 4) "The court must balance the defendant's First Amendment right of anonymous free speech against the strength of the prima facie case presented and the necessity for the disclosure of the anonymous defendant's identity to allow the plaintiff properly to proceed."

<u>Dendrite</u>, 775 A.2d at 760-761. This test, with slight modifications, has been widely followed by

subsequent courts. <u>See</u> <u>Krinsky</u>, 2008 WL 315192, at *7-11; <u>Greenbaum v. Google</u>, 845

N.Y.S.2d 695, 698-99 (Sup. Ct. N.Y. County 2007); <u>Mobilisa, Inc. v. Doe I</u>, 170 P.3d 712, 719-

21 (Ariz. App. 2007); <u>Cahill</u>, 884 A.2d at 459-60; <u>Highfields Capital Mgmt. L.P.</u>, 385 F. Supp.

2d 969, 974-76 (N.D. Cal. 2005); <u>In re Ottinger v. The Journal News</u>, No. 08-03892 (Sup. Ct.

Westchester Co. June 27, 2008) (copy attached for the convenience of the Court).[5]

---

[5] In <u>Sony</u>, Judge Chin of this district considered the following factors: (1) "a concrete showing of a prima facie claim of actionable harm," (2) "specificity of the discovery request,"

For example, just a few weeks ago, in <u>Doe I v. Individuals</u>, 2008 WL 2428206 (copy attached for the convenience of the Court), the district court in Connecticut, closely adhering to <u>Dendrite</u>, announced the following standard in a case seeking disclosure of information that could identify an anonymous poster:

> First, the Court should consider whether the plaintiff has undertaken efforts to notify the anonymous posters that they are the subject of a subpoena and [withhold] action to afford the fictitiously named defendants a reasonable opportunity to file and serve opposition to the application. See <u>Krinsky v. Doe 6</u>, 159 Cal Rptr.3d 231 (Cal. App. 2008)(sic); <u>Dendrite Intern. Inc. v. Doe No. 3</u>, 775 A.2d 756, 760 (N.J.Super.2001).
>
> * * * *
>
> Second, the Court should consider whether the plaintiff has identified and set forth the exact statements purportedly made by each anonymous poster that the plaintiff alleges constitutes actionable speech. <u>Dendrite</u>, 775 A.2d at 760.
>
> * * * *
>
> The Court should also consider the specificity of the discovery request and whether there is an alternative means of obtaining the information called for in the subpoena. <u>Sony Music</u>, 326 F. Supp at 565; <u>Columbia Inc. v. SeesCandy.com</u>, 185 F.R.D. 573, 578, 580 (N.D.Cal.1999).
>
> * * * *
>
> Similarly, the Court should consider whether there is a central need for the subpoenaed information to advance the plaintiffs' claims.

---

(3) "the absence of alternative means to obtain the subpoenaed information; (4) "a central need for the subpoenaed information to advance the claim," and (5) "the party's expectation of privacy." 326 F. Supp. 2d at 556. Some courts have apparently understood Judge Chin, by "prima facie claim," to be referring to effectively a motion to dismiss standard, <u>see</u> <u>Mobilisa</u>, 170 P.3d at 720, but Judge Chin actually reviewed evidence beyond the pleading in making his determination, <u>see</u> 326 F. Supp. 2d at 565-66. To the extent that the <u>Sony</u> standard's "concrete showing" means the submission of actual evidence to support the claim, then at least as to claim viability it is quite similar to the <u>Dendrite</u> test. It should also be noted that the "speech" at issue in <u>Sony</u> was internet file sharing, an activity that, while Judge Chin held it to be entitled to some First Amendment protection, is "not engaging in true expression" and not "entitled to the broadest protection of the First Amendment." <u>Id.</u> at 564.

8

America Online, Inc., 2000 WL 1210372 at *7; Dendrite, 775 A.2d at 760-61.

* * * *

Next, the Court should consider the subpoenaed party's expectation of privacy at the time the online material was posted. Sony Music, 326 F. Supp.2d at 566-67; Verizon Internet Services, 257 F. Supp. 2d 244, 267-68 (D.D.C.2003), rev'd on other grounds, 351 F.3d 1229 (D.C.Cir.2003).

* * * *

Finally, and most importantly, the Court must consider whether the plaintiffs have made an adequate showing as to their claims against the anonymous defendant . . . . Several courts have required that a plaintiff make a concrete showing as to each element of a prima facie case against the defendant.  Highfields Capital Management L.P. v. Doe, 385 F. Supp. 2d 969, 976 (N.D. Cal.2005); Sony Music, 326 F. Supp. 2d at 565; Krinksy v. Doe 6, 72 Cal. Rptr. 3d at 245; Dendrite, 775 A.2d at 760-61. Under such a standard, "[w]hen there is a factual and legal basis for believing [actionable speech] has occurred, the writer's message will not be protected by the First Amendment." Krinsky, 72 Cal Rptr. 3d at 245. The Court finds such a standard strikes the most appropriate balance between the First Amendment rights of the defendant and the interest in the plaintiffs of pursuing their claims, ensuring that the plaintiff "is not merely seeking to harass or embarrass the speaker or stifle legitimate criticism." Id. at 244

Doe I v. Individuals, 2008 WL 2428206, at *4-5;[6] see also In re Ottinger (applying the Dendrite

standard in a case decided within the past few weeks).

As previously discussed, whether plaintiff could possibly make this showing

remains to be seen and cannot be assessed until plaintiff provides some argument (and evidence).

That said, there are strong reasons to doubt that plaintiff can carry his burden.

---

[6] Seescandy.com stated that, in addition to jurisdictional tests that would not, in this case, be relevant, the plaintiff "should establish to the Court's satisfaction that plaintiff's suit against defendant could withstand a motion to dismiss." 185 F.R.D. at 579.  Subsequent courts have generally rejected this standard as too lenient, see, e.g., Mobilisa, 170 P.3d at 720, although it should be noted that the Seescandy.com court actually went beyond the pleadings and examined the evidence and likened the procedure to establishing probable cause. 185 F.R.D. at 579-80.

9

1.    **Plaintiff Has Failed to Provide Adequate Notification to the Posters**

First, as to the notice requirement articulated in <u>Dendrite,</u> Mr. Zherka has failed to post his notice on the "pertinent message board." <u>Dendrite</u>, 775 A.2d at 760.    Although Mr. Zherka did place a makeshift notice (the "Notice") on a comments section of the LoHud.com website, the choice of position does not seem to be reasonably calculated to give actual notice to the Posters.  Specifically, Mr. Zherka's Notice appeared as a comment under the <u>Journal News</u> staff-written blog entry entitled "Know Your Audience," which (although it appeared in the "Politics on Hudson" section) was seemingly unrelated to the current lawsuit or to the controversies that give rise to it.  Fowler Aff. ¶ 7.  The "Know Your Audience" blog entry described a fundraising event for a Larchmont, New York, politician, who is running for state Senate.  <u>Id</u>.  Neither the title of the blog nor its subject matter would seem to suggest to that reader that this would be a logical place to find discussion concerning the political controversies in Yonkers that are at the heart of this lawsuit.  Moreover, with each passing day, the Notice became increasingly difficult for readers to locate (even if they were actively seeking to do so), as subsequent blog entries pushed the "Know Your Audience" blog off of the first page of the "Politics on the Hudson" and deeper and deeper into the archive.  <u>Id</u>.

Equally important, the Notice failed to indicate that the Posters could seek to intervene in this case <u>anonymously</u> in order to challenge the propriety of the subpoenas.  Fowler Aff. ¶¶ 6 and 8 and Exh. B.  It is essential for the notification to make clear that persons seeking to challenge subpoenas may seek to appear anonymously.  In the absence that assurance, potential intervenors may naturally fear that, in coming forward to challenge the subpoenas, they will inevitably be forced to give up their anonymity – thereby relinquishing the very constitutional right they would be seeking to protect.

10

**2.    Plaintiff Must Identify the Exact Statements in Question – in Context**

Mr. Zherka's Complaint must be examined to determine whether he has properly set forth the exact statements on which his claims are based. In this regard, The Journal News acknowledges that the Complaint does purport to quote the postings complained of. However, the quotations are often in truncated form (with ample use of ellipses) and their meaning sometimes seems to depend on references to other postings which are not included in the complaint. Consequently, The Journal News submits that Mr. Zherka should be required to provide the Court with the full context of the statements about which he complains. See France v. St. Clare's Hospital, 82 A.D.2d 1, 441 N.Y.S.2d 79 (1st Dep't 1981) (courts must take into account the "larger context in which statements [are] published, including the nature of the particular forum").

**3.    Plaintiff Has an Alternative Means of Obtaining the Information**

As per Doe I v. Individuals, 2008 WL 2428206, at *4, the Court should also consider "the specificity of the discovery request and whether there is an alternative means of obtaining the information called for in the subpoena." Here, there may in fact be an alternative means of discovering the information sought from The Journal News. Mr. Zherka's counsel advised counsel for The Journal News in early July 2008, that it was his understanding that one of the non-pseudonymous defendants in this case may know (and may even have previously disclosed) the identities of the Posters using the screen names "Mob Buster" and "Ethan Edwards." Fowler Aff. ¶11. The Journal News respectfully submits that, under Doe I v. Individuals and Sony Music Entm't Inc. v. Does 1-40, Mr. Zherka should be required, at the very

least, to exhaust any alternative means of obtaining the subpoenaed information (i.e., by taking the relevant defendant's deposition) before seeking to enforce the subpoenas against Gannett.[7]

## 4.    Plaintiff Must Make a Factual Showing as to Each Element of the Claims

Most importantly, in order to compel disclosure of potentially identifying information, plaintiff is required to make a concrete showing as to each element of a prima facie case against each of the pseudonymous defendants. See Doe I v. Individuals, 2008 WL 2428206, at * 5; see also Highfields Capital Management L.P. v. Doe, 385 F Supp. 2d 969, 976 (N.D. Cal.2005); Sony Music, 326 F.Supp.2d at 565; Krinksy v. Doe 6, 72 Cal.Rptr.3d at 245; Dendrite, 775 A.2d at 760-61.

The Journal News does not intend to wade deeply into the merits of the underlying action. Any such analysis, if required, is properly deferred until the Posters themselves have been given opportunity to intervene, and moreover it is Mr. Zherka's burden in the first instance to demonstrate the validity of his claim. Nevertheless, it is immediately apparent from reviewing the complaint that plaintiff faces significant hurdles, which he seems unlikely to overcome.

As previously stated, it is well-settled that the defamatory nature of a statement must be assessed in full context and as a reasonable reader would understand it. See Gross v. N.Y. Times, 82 N.Y.2d 146, 152-53, 603 N.Y.S.2d 813 (1993); Miness v. Alter, 262 A.D.2d 374, 375, 691 N.Y.S.2d 171 (2d Dep't 1999); Bernard v. Grenci, 48 A.D.3d 722, 2008 WL 526251, at *2 (2d Dep't Feb. 26, 2008). Upon reading the comments in their full context, rather

---

[7] In any event, Mr. Zherka has asked for far more information than he needs to determine whether the records of The Journal News could lead to the identification of the Posters. The subpoena improperly seeks "all documents concerning the true identity" of the Posters, rather than documents "sufficient to show" such identifying information, if any.

than merely the excerpts cited by Mr. Zherka in the Complaint, there are certainly significant questions as to whether at least some of the statements complained are, in fact, actionable.

For example, some of the disparaging comments do not appear to be "of and concerning" Mr. Zherka, but instead refer to other individuals, who may have some connection to Mr. Zherka. See Cusak v. 60 Minutes Div. of CBS, Inc., 29 Media L. Rep. 2067 (Sup. Ct. N.Y. County (2001) (copy attached for the convenience of the Court) (plaintiff must show that allegedly defamatory statement was about him).

Some statements, though undoubtedly pejorative, may nonetheless qualify as protected opinion when read in context. See Foley v. CBS Broadcasting, Inc., No. 169463/05 (Sup. Ct. N.Y. Co. Sept. 13, 2006) (copy attached for the convenience of the Court) (statements in broadcast calling local businesswoman "con artist" who ran "crooked business" and engaged in a "scam" and "ripped off customers" constituted protected opinion). Indeed, internet forums, in general, tend to be wide-open and lend themselves to the sort of "loose, figurative, or hyperbolic" speech that may negate any inference on the observer's part that actual facts are being conveyed. See 600 W. 115th St. v. Von Gutfeld, 80 N.Y.2d 130, 139-40 (N.Y. 1992). Given the plainly heated nature of the comment threads, it is at least a serious question as to whether plaintiffs could ever demonstrate that comments such as "I suggest that the US Attorney should be notified about all this . . ." or "These people are dangerous, and it [is] really serious territory, the authorities MUST be contacted" would be understood by the reader as actually intending to convey facts about wrongdoing or rather conjecture about whether there has been wrongdoing, which is not actionable. See id. at 143-44 (statement that plaintiff's application was "as fraudulent as you can get and it smells of bribery and corruption" was not actionable; given circumstances and tenor of remarks, no reasonable listener would have understood factual

assertions to be conveyed); Bernard, 2008 WL 526251, at *2 ("Accusations of the use of political influence to gain some benefit from the government are not defamatory and do not constitute libel per se.").

Most fundamentally, Mr. Zherka "must produce sufficient evidence supporting each element of its cause of action, on a prima facie basis." Dendrite, 775 A.2d at 760 (emphasis added). Mere rhetoric is not enough. Unless Mr. Zherka can come forward with affidavits or documentary evidence on elements of a defamation claim such as falsity, injury to reputation, and fault, the Court should protect the identities of the Posters.[8]

If plaintiff cannot meet the stringent test set forth in cases such as Dendrite Int'l v. Doe No. 3 and Doe I v. Individuals, Gannett respectfully urges that the Court should protect the identities of the Posters.

---

[8] Under Dendrite, "The court must [also] balance the defendant's First Amendment right of anonymous free speech against the strength of the prima facie case presented and the necessity for the disclosure of the anonymous defendant's identity to allow the plaintiff properly to proceed." Dendrite, 775 A.2d at 760. In this context, the Court may also take into account the fact that Mr. Zherka may well qualify as a limited purpose public figure, in which case he would have to prove, by clear and convincing evidence, that the statements were made with knowledge of falsity or a high degree of awareness that they were probably false.

14

## CONCLUSION

For the foregoing reasons, The Journal News respectfully requests that the Subpoenas be quashed in their entirety or, in the alternative, that the Court order that reasonable notice and an opportunity to intervene be given to the anonymous Posters and stay further proceedings for a reasonable length of time to allow such intervention.

Dated:    New York, New York
          July 28, 2008

                              SATTERLEE STEPHENS BURKE & BURKE LLP

                              By: _____

                                  Mark A. Fowler (MF-4605)
                                  Glenn C. Edwards (GE-0696)
                                  Attorneys for Non-Party Gannett Satellite
                                  Information Network, Inc.
                                  230 Park Avenue
                                  New York, New York 10169
                                  (212) 818-9200

15

# Appendix:

1. <u>Cusak v. 60 Minutes Div. of CBS, Inc.</u>, 29 Media L. Rep. 2067 (Sup. Ct. N.Y.Co. Sept. 13, 2006)

2. <u>Doe I v. Individuals,</u> __ F. Supp. 2d __, 2008 WL 2428206 (D. Conn. June 13, 2008)

3. <u>Foley v. CBS Broadcasting</u>, No. 169463/05 (Sup. Ct. N.Y. Co. Sept. 13, 2006)

4. <u>In re Ottinger v. The Journal News</u>, 08-03892 (Sup. Ct. Westchester Co. June 27, 2008)

# Appendix 1:

# <u>Cusak v. 60 Minutes Div. of CBS, Inc</u>

Case 7:08-cv-02062-CS-MDF Document 33-2 Filed 07/28/2008 Page 3 of 36

broadcast in Georgia, jurisdiction was proper. Such purposeful contact with the state required him to answer for any resulting harm in Georgia courts. *Id.* The Georgia Supreme Court concluded that while such contacts might satisfy due process concerns, they did not suffice for purposes of subsection (3) of the long-arm statute. The court explained that "Cassells has not regularly done or solicited business in the State of Georgia. He has not engaged in any persistent course of conduct in this state, and Cassells, as opposed to [his employer], does not derive substantial revenue from goods used or consumed or services rendered in this state." *Id.* at 618 (citations omitted). Therefore, Cassells was properly dismissed from the suit.

The instant case is on all fours with *Bradlee*. Like Cassells, Gordon prepared and drafted the news article at issue in her Washington, D.C. office. She is not a resident of Georgia and has only traveled to the state for three brief visits since 1989. [Def. Mot. to Dismiss, Gordon Decl. at 2; Def. Reply to Pl. Rsp. to Mot. to Dismiss, Gordon Decl. at 1-2]. According to her sworn declaration, her only remaining contacts with the state of Georgia consist of telephone conversations in conjunction with the preparation of the news article. [Def. Reply to Pl. Rsp. to Mot. to Dismiss, Gordon Decl. at 2]. In light of this evidence and controlling precedent, it appears that Gordon does not have the requisite contacts with the state of Georgia to trigger personal jurisdiction under subsection (3).

Plaintiff's reliance on *Process Control Corp. v. Witherup Fabrication*, 439 F.Supp. 1284 (N.D. Ga. 1977), is unavailing. There, the court found that personal jurisdiction under subsection (3) may be proper in a defamation action if a nonresident defendant has contacts with the forum state independent of the allegedly defamatory acts. *Id.* at 1287. That court authorized discovery to proceed based upon the plaintiff's contention that such contacts existed. *Id.* However, in the instant case, neither Plaintiff's complaint nor his response to Defendant's motion to dismiss contains factual allegations from which the court could infer that jurisdiction over Gordon is proper under subsection (3).

In his response to the motion to dismiss, Plaintiff simply states that he "anticipates discoverable facts will demonstrate to the Court that Defendant Gordon regularly engages in a persistent course of conduct with the State of Georgia which subjects her to the jurisdiction of this Court." [Pl. Rsp. to Def. Mot. to Dismiss at 8]. The only specific examples of Gordon's contacts with Georgia, however, relate to Gordon's news article containing the allegedly defamatory statements. [*See* Pl. Rsp. to Def. Mot. to Dismiss at 6 (reasoning "[f]or Defendant to write the defamatory story in question, which concerned events that took place within the State of Georgia, she must have had some continuous contacts here.")]. Under *Bradlee*, any such contacts would be irrelevant to an evaluation of the propriety of personal jurisdiction under Georgia's long-arm statute. *See Bradlee*, 249 Ga. at 617. Rather, for the court to authorize discovery on this issue, Plaintiff must allege that Gordon engaged in some course of conduct unrelated to the news article such that jurisdiction might be warranted under subsection (3). Having failed to do so, and having failed to controvert the assertions contained in Gordon's two sworn declarations, Plaintiff's bald assertions regarding the need for discovery cannot suffice.

Because the court finds that personal jurisdiction is not proper under Georgia's long-arm statute, the court need not analyze whether Gordon's contacts with the state satisfy the due process clause of the Fourteenth Amendment.

Accordingly, Defendant Marcy Gordon's motion to dismiss [#4] is hereby GRANTED. All claims asserted against Defendant Marcy Gordon are dismissed with prejudice.

---

## Cusack v. 60 Minutes Division of CBS Inc.

### New York Supreme Court
### New York County

LAWRENCE X. CUSACK III, et al. v. 60 MINUTES DIVISION OF CBS INC., CBS INC., DON HEWITT, ED BRADLEY, MICHAEL RADUTZKY, JONATHAN H. WELLS, DUAYNE J. DILLON, SEYMOUR M. HERSH, ROBERT L. WHITE, JOHN DOE 1-5, and MARY DOE 1-5

Index No. 600060/98

June 20, 2001

*Gannett Inc.*

contained in restricts the on in cases ndment con- of libel re- ct to satisfy essary in as- es of tortious *Connor*, 365 on (2) func- xercising ju- dants whose he allegedly *iervs., Inc. v.* Med.L.Rptr. e proper un- ant has con- from those

diction over gularly does in any other derives sub- or consumed ." O.C.G.A. uirements of onal jurisdic- because the for defama- 439 F.Supp. ling that the in subsection n under sub- es that a non- ent contacts edly defama-

*. Servs., Inc.* L.Rptr. 1968] e, a Georgia suit in state d Andy Cas- u chief. *Id.* at news report, Washington ia, contained sells filed a ersonal juris- ginia resident Washington ient contacts sfy the long- l court deter- ared the story at it would be

## REGULATION OF MEDIA CONTENT

**[1] Defamation — Defamatory content — In general (§ 11.0501)**

**Defamation — Related causes of action — In general (§ 11.5801)**

Non-investor plaintiffs are collaterally estopped from asserting claims for defamation and trade libel against broadcast defendants for statements made during television newsmagazine intimating that plaintiffs sold to investors forged documents purportedly implicating President John F. Kennedy and others in various scandals, since one plaintiff was convicted of mail and wire fraud, since conviction was final, since that plaintiff had full and fair opportunity to litigate, and since non-investor plaintiffs were in privity with convicted plaintiff.

**[2] Defamation — Defamatory content — "Of and concerning" (§ 11.0502)**

Investor plaintiffs' defamation claim against broadcast defendants for statements made during television newsmagazine intimating that plaintiffs purchased forged documents purportedly implicating President John F. Kennedy and others in various scandals, is dismissed, since plaintiffs failed to demonstrate that any allegedly defamatory statement in program was about them.

**[3] Defamation — Related causes of action — In general (§ 11.5801)**

Investor plaintiffs failed to demonstrate that broadcast defendants committed trade libel in airing statements during segment of television newsmagazine intimating that plaintiffs purchased forged documents purportedly implicating President John F. Kennedy and others in various scandals, since plaintiffs did not raise genuine dispute as to truth of defendants' claims that documents were forged, and since plaintiffs failed to demonstrate that defendants acted in grossly irresponsible manner.

**[4] Defamation — Related causes of action — In general (§ 11.5801)**

**Liability for non-defamatory communication — In general (§ 14.01)**

**Commercial speech/advertising — In**

general (§ 15.01)

**Contractual obligations — In general (§ 23.01)**

Plaintiffs cannot succeed on claims for fraud, interference with contractual relations and advantageous relations, breach of contract or inducing breach of contract, breach of implied covenant of good faith and fair dealing or inducing breach thereof, breach of confidential and fiduciary relationship and breach of third-party beneficiary contract, deceptive business practices in violation of N.Y. Gen. Bus. Law § 349, false advertising in violation of N.Y. Gen. Bus. Law § 350, false designation of origin and unfair competition in violation of Lanham Act § 47(a), intentional or negligent infliction of emotional stress, malicious investigation or continuation of frivolous grand jury investigation, and unjust enrichment, against broadcast defendants for statements made during television newsmagazine intimating that plaintiffs sold investors forged documents purportedly implicating President John F. Kennedy and others in various scandals, since damages plaintiffs claim to have suffered were not proximately or indirectly caused by defendants' actions, but were caused by fabrication of documents, since cause of action for fraud does not arise when only fraud alleged relates to party's intent to breach promise, since plaintiffs failed to allege terms of any contract with which defendants may have interfered, since plaintiffs failed to contend that defendants were motivated solely by malice or effected interference by unlawful means, since plaintiffs failed to allege any facts showing fiduciary duty between any of them and defendants, since N.Y. Gen. Bus. Law §§ 349 and 350 pertain to commercial activity only, since Lanham Act applies only to false and misleading commercial speech, since defendants' alleged conduct is not sufficiently outrageous and extreme so as to constitute intentional infliction of emotional distress, and since defendants' conduct did not constitute negligent infliction of emotional distress.

———

Action for defamation, trade libel, fraud, interference with contractual relations and advantageous relations, breach of contract or inducing breach of contract, breach of implied covenant of good faith and fair dealing or inducing the breach thereof, breach of confidential and fiduciary relationship and breach of third-party beneficiary contract, deceptive

business practices in [...]
Bus. Law § 349, false [...]
of N.Y. Gen. Bus. L[...]
tion of origin and unf[...]
tion of § 47(a) of the [...]
or negligent infliction[...]
licious investigation [...]
frivolous grand jury [...]
enrichment. On defe[...]
mary judgment and [...]
to engage in discover[...]
tial summary judgm[...]
copies of plaintiffs' e[...]

Defendants' motio[...]
cross-motions grante[...]
part.

Carl E. Person, N[...]
tiff.

Susanna M. Low[...]
sel for litigation, an[...]
assistant general co[...]
Inc., New York; a[...]
Brown, of Levine, S[...]
ton, D.C., for defer[...]
Ed Bradley, Mic[...]
Wells, and Duayne [...]

Michael Nussbau[...]
man, of Ropes & G[...]
defendant Seymour [...]

Peter Sweeney, o[...]
New York, for defe[...]

**Kapnick, J.:**

Motion sequence [...]
solidated for dispos[...]

In motion sequ[...]
CBS Broadcasting, [...]
as "60 Minutes Di[...]
Hewitt, Ed Brad[...]
Jonathan H. Wells[...]
lectively "the CBS[...]
ant to CPLR § 32[...]
ment dismissing t[...]
plaint. Defendant [...]
motion and seeks s[...]
ing the complaint [...]
grounds.

Plaintiffs cross-[...]
suant to CPLR § 3[...]
gage in discovery [...]
§§ 2201 and 221[...]
days, so as to affor[...]
tunity to move pu[...]
a new several tri[...]
dictment;[1] *(iii)* [...]

———

[1] Plaintiff Cusack [...]
amended petition pur[...]

*Cusack v. 60 Minutes Division of CBS Inc.*

*tes Division of CBS Inc.*

)

ations — In general

ucceed on claims for
th contractual relations
ions, breach of contract
contract, breach of im-
d faith and fair dealing
ereof, breach of confi-
elationship and breach
ary contract, deceptive
violation of N.Y. Gen.
advertising in violation
v § 350, false designa-
ir competition in viola-
§ 47(a), intentional or
emotional stress, mali-
continuation of frivo-
gation, and unjust en-
adcast defendants for
television newsmaga-
aintiffs sold investors
rportedly implicating
edy and others in vari-
ages plaintiffs claim to
proximately or indi-
ants' actions, but were
of documents, since
d does not arise when
es to party's intent to
plaintiffs failed to al-
act with which defen-
ered, since plaintiffs
efendants were moti-
r effected interference
ce plaintiffs failed to
g fiduciary duty be-
efendants, since N.Y.
and 350 pertain to
r, since Lanham Act
misleading commer-
ants' alleged conduct
eous and extreme so
al infliction of emo-
defendants' conduct
ant infliction of emo-




trade libel, fraud, in-
al relations and ad-
ch of contract or in-
, breach of implied
d fair dealing or in-
breach of confiden-
ship and breach of
contract, deceptive

business practices in violation of N.Y. Gen.
Bus. Law § 349, false advertising in violation
of N.Y. Gen. Bus. Law § 350, false designa-
tion of origin and unfair competition in viola-
tion of § 47(a) of the Lanham Act, intentional
or negligent infliction of emotional stress, ma-
licious investigation or continuation of a
frivolous grand jury investigation, and unjust
enrichment. On defendants' motion for sum-
mary judgment and plaintiffs' cross-motions
to engage in discovery, to stay action, for par-
tial summary judgment, and to serve and file
copies of plaintiffs' executed affidavits.

Defendants' motion granted and plaintiffs'
cross-motions granted in part and denied in
part.

Carl E. Person, New York, N.Y., for plain-
tiff.

Susanna M. Lowy, associate general coun-
sel for litigation, and Anthony M. Bongiorno,
assistant general counsel of litigation, CBS
Inc., New York; and Lee Levine and Jay
Brown, of Levine, Sullivan & Koch, Washing-
ton, D.C., for defendants CBS, Don Hewitt,
Ed Bradley, Michael Radutzky, Jonathan
Wells, and Duayne Dillon.

Michael Nussbaum and J. Stephen Baugh-
man, of Ropes & Gray, Washington, D.C., for
defendant Seymour Hersh.

Peter Sweeney, of Schwimmer & Sweeney,
New York, for defendant Robert White.

**Kapnick, J.:**

Motion sequence nos. 009 and 010 are con-
solidated for disposition.

In motion sequence no. 009, defendants
CBS Broadcasting, Inc. ("CBS") (sued herein
as "60 Minutes Division of CBS, Inc."), Don
Hewitt, Ed Bradley, Michael Radutzky,
Jonathan H. Wells and Duayne J. Dillon (col-
lectively "the CBS defendants") move pursu-
ant to CPLR § 3212(a), for summary judg-
ment dismissing the second amended com-
plaint. Defendant Robert L. White joins in the
motion and seeks summary judgment dismiss-
ing the complaint against him on the same
grounds.

Plaintiffs cross-move for an order: *(i)* pur-
suant to CPLR § 3212(f) allowing them to en-
gage in discovery; or *(ii)* pursuant to CPLR
§§ 2201 and 2214 staying this action for 90
days, so as to afford plaintiff Cusack an oppor-
tunity to move pursuant to 28 USC § 2255 for
a new criminal trial and/or dismissal of the in-
dictment;[1] *(iii)* granting them partial sum-

mary judgment on their first, fifth and sixth
causes of action, which allege, respectively,
fraud, breach of contract, and breach of the
implied covenant of good faith and fair deal-
ing; and *(iv)* permitting them to serve and file
copies of Cusack's executed affidavit no later
than five business days prior to service of de-
fendants' reply papers.

In motion sequence 010, defendant Sey-
mour M. Hersh moves for summary judgment
dismissing the second amended complaint
against him, and plaintiffs cross-move for the
same relief that they seek in motion sequence
no. 009.

**Background**

This action arises out of a November 23,
1997 broadcast of *60 Minutes* (the "Pro-
gram") concerning a large body of documents
(the "Cusack Papers" or "Documents") that
purportedly implicated President John F.
Kennedy, as well as certain other individuals,
including Marilyn Monroe, Robert F.
Kennedy and Joseph P. Kennedy, Sr., in vari-
ous scandals. Plaintiffs Lawrence X. Cusack
III, Jennifer Rush Cusack, and their company,
Geneva Archives, Inc. ("Geneva"), sold the
Cusack Papers, through plaintiff Thomas G.
Cloud (a dealer in rare documents), to plain-
tiff investors for more than $7 million, of
which Cusack's share exceeded $5 million.
The Program intimated that the Documents
had been fabricated and suggested that Cusack
might have forged them. Plaintiffs allege that
the Program defamed them and libeled the
Cusack Papers.

In addition, plaintiffs allege (although
plaintiffs, other than the Cusacks, Cloud, Rob-
ert C. Losure, Gary F. Vick, and the compa-
nies that the Cusacks and Cloud control, lack
standing to do so) that the CBS defendants
failed to keep certain promises that they had
made to the Cusacks, Cloud, Losure, and Vick
about the Program, that Cusack and Cloud
provided documents from the Cusack Papers,
and that Cusack, Cloud, Losure, and Vick oth-
erwise co-operated in the preparation of the
Program, in reliance upon those promises.
Plaintiffs also allege that defendant Hersh
breached a contract that he had entered into
with Cusack and Cloud, and that he defamed
plaintiffs during interviews on two CNBC

---

[1] Plaintiff Cusack has since filed a petition and
amended petition pursuant to Section 2255. The matter

is not scheduled to be fully submitted before Judge
Denise L. Cote of the United State District Court for
the Southern District of New York, until June 22, 2001.
Plaintiff now requests that this Court stay all proceed-
ings until Judge Cote has vacated the criminal judg-
ment against Cusack or has denied Cusack's petition.

television programs that were broadcast subsequent to the *60 Minutes* Program.

Defendants Hewitt, Radutzky and Wells are employed by CBS and were involved in planning and preparing the Program. Dillon, an expert in the analysis of handwriting who was retained by CBS, and White, a collector of memorabilia associated with President Kennedy, were interviewed on the Program. Hersh was writing a book about the Kennedy Presidency and was eager to gain access to the Cusack Papers. Cusack, in turn, was eager to have Hersh discuss the Documents in his forthcoming book because he anticipated that the publicity that would attend the publication of Hersh's book would greatly increase the value of the Documents. Hersh initially believed that the Documents were genuine, but he was subsequently persuaded that they had been fabricated.

On September 25, 1997, the ABC News program *20/20* broadcast a report in which Cusack was interviewed and in which the Cusack Papers were described as forgeries that had been perpetrated by Cusack. Claiming that Cusack had been "ambushed" by the *20/20* program, one of the investor plaintiffs herein, and an individual who was working as a paralegal in the office of Cusack's attorney, approached CBS in the hope that it would criticize the *20/20* report and present Cusack's and Cloud's view of the Cusack Papers.[2]

*60 Minutes* retained Dillon on the recommendation of the United States Postal Service and the FBI. After studying the documents provided by Cusack and Cloud and comparing the handwriting thereon to that on documents at the Kennedy Library, Dillon concluded that the documents that had been provided by plaintiffs were forgeries.[3] White, whom plaintiffs had expected to vouch for the authenticity of the Cusack Papers (in conformance with his earlier opinion), stated on the Program (or was quoted as having stated) that while he had earlier opined that the handwriting on certain of the Documents was that of President Kennedy, he was not a forensic handwriting expert, and he had not examined any of the Documents under a microscope. When he was asked why Cusack and Cloud had presented him as the person who would certify that the handwriting on certain of the documents was authentic, White replied, "I can only say that

desperate people at some point do desperate things." Hersh was neither interviewed nor quoted on the Program, but Hersh reported that Hersh had deleted from his forthcoming book, *The Dark Side of Camelot*, the chapter that he had written on the basis of the Cusack Papers.

On April 30, 1999, a jury in the United States District Court for the Southern District of New York convicted Cusack on 13 counts of mail and wire fraud. *United States v Cusack*, 98 CR 691 (SDNY). In her Opinion and Order dated September 17, 1999, Judge Denise L. Cote, who had presided over the trial, explained that "[t]he evidence at trial conclusively demonstrated that all of the Cusack Documents are indeed fakes and were authored by Cusack." (66 F.Supp.2d 493, 498). While rejecting the prosecution's argument that Cusack obstructed justice by commencing this action, as well as a similar action against ABC in the Southern District of New York *(Thomas G. Cloud, et al., v. ABC, Inc., et al.,* 97 Civ. 8702), which was subsequently dismissed by order of Judge John S. Martin, Jr. dated October 26, 1999, Judge Cote noted at the sentencing hearing held on September 17, 1999 that "the complaints are facially outrageous in light of the overwhelming evidence at trial that Mr. Cusack was the author of the documents at issue and that he had invented out of whole cloth a relationship between his father and President Kennedy, motivated by a desire to earn millions of dollars." Judge Cote sentenced Cusack to 115 months in prison and three years supervised release, and ordered him to pay full restitution to the ultimate purchasers of the Cusack Papers, in the approximate amount of $7 million.

The judgment was affirmed by the United States Court of Appeals for the Second Circuit on October 13, 2000. (229 F.3d 344).

## Discussion

### A. Defamation and Trade Libel

#### 1. Collateral Estoppel

Defendants contend that all of the plaintiffs are collaterally estopped from bringing their claims alleging defamation and trade libel, by virtue of Cusack's criminal conviction.

"Collateral estoppel, an equitable doctrine, is based upon the general notion that a party, or one in privity with a party, should not be permitted to relitigate an issue decided against it (citations omitted)." *D'Arata v. New York*

*Central Mu* 659, 664 (1!

"The part estoppel has identity of t and the pric *Lilly & Co.* that the issu in the prior *Pattersonvi* [1982]). "[T application absence of gate the issu *Eli Lilly &* by *Pergam* A.D.2d 92,

Plaintiffs final, that C mum Cons of prosecu assistance trial couns mail fraud essarily e forged the event, non sack) had criminal ch

#### a. Finalit Litigat

Plaintiff tion is not sack's app new trial

[1] How noted, Cu mined pu States Cou on Octobe viction.

"In any pendency of an ord tions om A.D.2d 8 *dism'd,* 9

Similar tion for a the crimi case.

Moreo their bur absence gate the action.

---

[2] Apparently, the paralegal who approached CBS is the wife of Cusack's attorney.

[3] The *20/20* program had focused on the typewritten portions of the documents.

ision of CBS Inc.

int do desperate
interviewed nor
the Program re-
d from his forth-
of Camelot, the
n the basis of the

y in the United
Southern District
ck on 13 counts
ed *States v Cu-*
her Opinion and
, 1999, Judge
resided over the
evidence at trial
at all of the Cu-
fakes and were
F.Supp.2d 493,
secution's argu-
justice by com-
a similar action
District of New
, v. ABC, Inc.,
as subsequently
John S. Martin,
dge Cote noted
d on September
are facially out-
elming evidence
e author of the
e had invented
hip between his
motivated by a
rs." Judge Cote
hs in prison and
e, and ordered
e ultimate pur-
in the approxi-

by the United
Second Circuit
d 344).

ibel

of the plaintiffs
bringing their
trade libel, by
viction.

itable doctrine,
on that a party,
should not be
ecided against
a v. New York

## Central column

*Central Mutual Fire Insur. Co.,* 76 N.Y.2d 659, 664 (1990).

"The party seeking the benefit of collateral estoppel has the burden of demonstrating the identity of the issues in the present litigation and the prior determination" (*Kaufman v. Eli Lilly & Co.,* 65 N.Y.2d 449, 456 [1985]) and that the issues "have been necessarily decided in the prior proceeding" (*Capital Tel. Co. v Pattersonville Tel. Co.,* 56 N.Y.2d 11, 17 [1982]). "[T]he party attempting to defeat its application has the burden of establishing the absence of a full and fair opportunity to litigate the issue in the prior action." *Kaufman v. Eli Lilly & Co., supra* at 456. *See also, Color by Pergament v. O'Henry's Film Works,* 278 A.D.2d 92, (1st Dep't 2000).

Plaintiffs contend that the conviction is not final, that Cusack's trial failed to meet minimum Constitutional requirements (as a result of prosecutorial misconduct and ineffective assistance of counsel on the part of Cusack's trial counsel), that Cusack's conviction on mail fraud and wire fraud charges did not necessarily entail a finding that Cusack had forged the Cusack Papers, and that, in any event, none of the plaintiffs (including Cusack) had any control over the litigation of the criminal charges against Cusack.

### a. Finality/Full and Fair Opportunity to Litigate

Plaintiffs' contention that Cusack's conviction is not final rests on the pendency of Cusack's appeal and his pending petition for a new trial pursuant to 28 USC § 2255.

[1] However, as this Court has already noted, Cusack's appeal has since been determined pursuant to the decision of the United States Court of Appeals for the Second Circuit on October 13, 2000, affirming Cusack's conviction.

"In any event, it is well established that the pendency of an appeal does not affect the use of an order or judgment as an estoppel (citations omitted)." *Matter of Capoccia,* 272 A.D.2d 838, 847 (3rd Dep't 2000), *lv. to app. dism'd,* 95 N.Y.2d 887 (2000).

Similarly, the pendency of Cusack's petition for a new trial does not affect the use of the criminal judgment as an estoppel in this case.

Moreover, plaintiffs have failed to meet their burden of establishing to this Court the absence of a full and fair opportunity to litigate the issues raised herein in the criminal action.

### b. Issue Necessarily Found in First Action

The indictment on which Cusack was prosecuted charged that:

[b]eginning in or about 1993, [Cusack] commenced a fraudulent scheme. The scheme involved (1) causing the purported signatures and/or purported handwriting of President John F. Kennedy (hereinafter, "Kennedy") and others to be forged on hundreds of documents, (2) falsely and fraudulently representing to prospective buyers, investors, and others that his father had a secret and previously undisclosed relationship as advisor to Kennedy, that he had found these documents among his father's files, and that the purported signatures and/or handwriting of Kennedy and others were present on the documents at the time he found them, [and] (3) marketing the documents for sale, and selling many of them on the same false and fraudulent pretense that they were authentic, . . . .

Each count in the indictment charged Cusack with having devised:

a scheme to obtain money from purchasers of the Kennedy documents and others based on the false and fraudulent representations and pretenses that the documents came from the files of Cusack Sr. and contained the genuine handwriting of John F. Kennedy and/or other persons, . . . .

Inasmuch as (1) Cusack was convicted on every count in the indictment, (2) Judge Cote found that there had been overwhelming and conclusive evidence that Cusack had forged the Documents, and (3) there was no evidence that anyone other than Cusack had forged them, or had an opportunity to do so, plaintiffs' argument that the jury's verdict did not necessarily decide that Cusack had forged the Documents, is frivolous.[4]

### c. Control of the Litigation

There is no dispute that none of the plaintiffs, except Cusack, was a party to Cusack's

[4] Although, as plaintiffs point out, the Government introduced only a small portion of the Cusack Papers in evidence in Cusack's trial, plaintiffs' argument in this action, that the Cusack Papers are authentic, is targeted precisely at the arguments that the Government made with regard to the Documents that were at issue in the criminal trial. Plaintiffs make no case for distinguishing between those Documents and the rest of the Cusack Papers.

trial, or exercised any control over it.[5] Defendants argue, nonetheless, that all of the plaintiffs were in "privity" with Cusack, and are, therefore, collaterally estopped from proceeding with this action by Cusack's criminal conviction. *See, Watts v. Swiss Bank Corp.*, 27 N.Y.2d 270 (1970).

As the Appellate Division, First Department, recently noted,

> [p]rivity has been described as "an amorphous term not susceptible to ease of application" (Gramatan Home Investors Corp. v. Lopez, 46 N.Y.2d 481, 486, 414 N.Y.S.2d 308, 386 N.E.2d 1328). The doctrine extends to "persons who were not parties to the previous action but who were connected with it to such an extent that they were treated as if they were parties" (id). "What is controlling is the identity of the issue which has necessarily been decided in the prior action or proceeding" (Ryan v. New York Tel. Co., 62 N.Y.2d 494, 500, 478 N.Y.S.2d 823, 467 N.E.2d 487).

*All Terrain Properties v. Hoy*, 265 A.D.2d 87, 93 (1st Dep't 2000). *See also, Buechel v. Bain*, 275 A.D.2d 65 (1st Dep't 2000).

"Generally, to establish privity the connection between the parties must be such that the interests of the nonparty can be said to have been represented in the prior proceeding (citations omitted)." *Green v. Santa Fe Indus., Inc.*, 70 N.Y.2d 244, 253 (1987). Thus, individuals and the corporations that they control have been held to be in privity. *See, Rainaldi v. Moran*, 214 A.D.2d 836 (3rd Dep't 1995); *Hernandez v. Nelson*, 143 A.D.2d 632 (2nd Dep't 1988). Similarly, a principal and agent are generally considered to be in privity. *See, Schneider v. Lazard Freres & Co.*, 159 A.D.2d 291 (1st Dep't 1990).

Plaintiffs Cusack and Jennifer Rush Cusack (Cusack's wife) are the founders, officers and principals of Geneva, through which they offered and sold the Documents. Accordingly, both Geneva and Jennifer Rush Cusack are in privity with Cusack *(Rainaldi v. Moran*, 214 A.D.2d 836, *supra; see also, A to Z Assocs. v. Cooper*, 161 Misc.2d 283 [Sup. Ct., N.Y. Co. 1993]) and are, therefore, barred from raising any claim that presupposes that Cusack did not fabricate the Documents.

---

[5] Plaintiffs' claim that Cusack himself had no control over the litigation of his case is untenable, inasmuch as Cusack freely chose his trial attorney, and never sought to discharge him.

Plaintiff Cloud is the founder, president and sole shareholder of plaintiffs Cloud & Associates Consulting, Inc. ("CAC") and National Historical Autographs, Inc. ("NHA"). While acting for their own benefit, Cloud, CAC and NHA also acted as Cusack's agents in the marketing of the Cusack Papers. Consequently, Cloud, CAC and NHA are also bound by Cusack's conviction. *See, Schneider v. Lazard Freres & Co.*, 159 A.D.2d 291, *supra*.

Defendants contend that the investor-plaintiffs are also in privity with Cusack because they claim to be third-party beneficiaries of Cusack's purported contract with CBS.

It is well settled that

> "the identity of a third-party beneficiary need not be set forth in the contract or, for that matter, even be known as of the time of its execution (citation omitted), that the intention which controls in determining whether a stranger to a contract qualifies as an intended third-party beneficiary is that of the promisee, . . . (citation omitted), and that, where, . . . , a genuine issue exists as to the parties' intention to benefit another, a triable issue of fact is presented which is not appropriate for summary disposition (citation omitted)."

*MK West Street Co. v. Meridien Hotels*, 184 A.D.2d 312, 313 (1st Dep't 1992).

Here, however, there is no contractual language or other circumstances indicating that either Cusack or Cloud had any specific intention to benefit the investor plaintiffs when they agreed to co-operate with CBS. Accordingly, despite their claim to the contrary, the investor plaintiffs are *not* third-party beneficiaries of any contract between Cusack and Cloud and any of the defendants. *First Capital Asset Mgt., Inc. v. N.A. Partners, L.P.*, 260 A.D.2d 179 (1st Dept 1999), *app. den.*, 93 N.Y.2d 817 (1999).

In addition, although the monetary value of the Documents that were purchased by the investor plaintiffs was decisively affected by Cusack's conviction, the rights asserted by those plaintiffs in this action are not "conditioned in one way or another on, or derivative of," *(D'Arata v New York Central Mut. Fire Ins., Co., supra* at 664) Cusack's rights at his trial. Accordingly, there is no basis for the investor plaintiffs to be bound by the judgment against Cusack.

For the foregoing reasons, Cusack, Jennifer Rush Cusack, Geneva, Cloud, CAC and NHA, but not the investor plaintiffs, are collaterally

nder, president and
s Cloud & Associ-
C'') and National
("NHA"). While
, Cloud, CAC and
k's agents in the
Papers. Conse-
HA are also bound
, *Schneider v. Laz-*
2d 291, *supra*.

at the investor-
with Cusack be-
d-party beneficia-
ontract with CBS.

party beneficiary
e contract or, for
*v*n as of the time
omitted), that the
in determining
*n*tract qualifies as
*e*ficiary is that of
*o*n omitted), and
*e* issue exists as
benefit another, a
*e*sented which is
*nary* disposition

*tien Hotels*, 184
992).

contractual lan-
s indicating that
*t*y specific inten-
plaintiffs when
h CBS. Accord-
*h*e contrary, the
*r*d-party benefi-
*e*n Cusack and
*n*ts. *First Capi-*
*rtners, L.P.*, 260
, *app. den.*, 93

*o*netary value of
*n*ased by the in-
*l*y affected by
*t*s asserted by
*r*e not "condi-
*n*, or derivative
*n*tral *Mut. Fire*
c's rights at his
*a*sis for the in-
*y* the judgment

*u*sack, Jennifer
*A*C and NHA,
*r*e collaterally

estopped from raising their claims of defama-
tion and trade libel.

### 2. *The Merits*

#### a. *Defamation*

[2] It is axiomatic that a plaintiff who al-
leges defamation must show that the statement
objected to is false and defamatory, and that it
concerns the plaintiff. *See, Foster v. Churchill*, 87
N.Y.2d 744 (1996); *Weldy v. Piedmont Air-
lines, Inc.*, 985 F.2d 57 (2nd Cir. 1993). The
investor-plaintiffs' claim alleging defamation
must be dismissed because these plaintiffs
have not shown that any allegedly defamatory
statement in the Program, or in the CNBC
broadcasts, is about them.

#### b. *Trade Libel*

By choosing to appear on the Program,
plaintiffs Losure and Gary F. Vick became
public figures for the limited purpose of the
Program. *See, Daniel Goldreyer, Ltd. v. Dow
Jones & Co.*, 259 A.D.2d 353 [27 Med.L.Rptr.
2247] (1st Dep't 1999), *app. withdrawn*, 93
N.Y.2d 1013 (1999); *Dameron v. Washington
Magazine, Inc.*, 779 F.2d 736 [12 Med.L.Rptr.
1508] (U.S. Ct. App., D.C. Cir. 1985), *cert.
den.* 476 U.S. 1141 (1986). As such, they must
prove "that a reasonable jury might find that
actual malice ha[s] been shown with convinc-
ing clarity." *Daniel Goldreyer, Ltd.*, *supra* at
353 (quoting *Anderson v. Liberty Lobby*, 477
U.S. 242, 257 [12 Med.L.Rptr. 2297] [1986]).
" 'Actual malice' has been defined as making
an alleged false statement with knowledge
that it was false or with reckless disregard as
to whether it was false or not *(New York Times
Co. v. Sullivan*, 376 U.S. 254, 279-280 [1
Med.L.Rptr. 1527]; *Thanasoulis v. National
Assn. for Specialty Foods Trade*, 226 A.D.2d
227, 228-229)." *Daniel Goldreyer, Ltd. v.
Dow Jones & Co.*, *supra* at 353.

The CBS defendants and Hersh are media
publishers. The Program indisputably dis-
cussed a matter of public concern. Accord-
ingly, in order to prevail on their claim against
the CBS defendants or Hersh for trade libel,
plaintiffs must show both that the statements
to which they object are false, and that the de-
fendants "acted in a grossly irresponsible
manner without due consideration for the
standards of information gathering and dis-
semination ordinarily followed by responsible
parties." *Chapadeau v. Utica Observer-
Dispatch*, 38 N.Y.2d 196, 199 [1 Med.L.Rptr.
1693] (1975). *See also, Gaeta v. New York
News*, 62 N.Y.2d 340 [10 Med.L.Rptr. 1966]

(1984); *Crucey v. Jackall*, 275 A.D.2d 258
(1st Dep't 2000). Plaintiffs have failed to
show either.

A party opposing summary judgment must
show by evidence in admissible form that
there is a genuine issue of material fact. *Al-
varez v. Prospect Hospital*, 68 N.Y.2d 320
(1986). Although plaintiffs have submitted let-
ters from a number of document examiners,
who have certified that certain of the Docu-
ments are authentic, not one of these certifica-
tions is sworn to.[6] The only probative evi-
dence in admissible form that plaintiffs have
presented to show that the documents were
not forged by Cusack, as the Program and
Hersh arguably implied, are the affidavits of
Nicholas J. Montano, Robert J. Phillips and
Robert F Slatzer.[7] At Cusack's trial, the Gov-
ernment proved, in part through the testimony
of Dillon, that Cusack had fabricated the
Documents and forged the purported hand-
writing of President Kennedy (and that of
other individuals) which ostensibly appeared
upon them. Dillon testified, *inter alia*, that
certain characteristics of the handwriting, pur-
ported to be President Kennedy's, bore certain
indicia of forgery.[8]

Mr. Montano, a graphologist who special-
izes in the study of the effects of biology on
penmanship, states that the characteristics dis-
cussed by Dillon may be due to the hypogly-
cemic condition of the writer, and that Addi-
son's disease, which President Kennedy has

---

[6] One such certification was written by John Dar-
vick, a long-time dealer in items associated with Presi-
dent Kennedy and Marilyn Monroe. Mr. Darvick has
also provided an affidavit, in which he refers to his ear-
lier certification, and states that he still believes that the
Documents that he had examined are authentic. How-
ever, Mr. Darvick does not claim to be a graphologist.

[7] Lou Ann Horstman has also submitted an affidavit.
Ms. Horstman is employed by plaintiffs' current attor-
ney. As such, she may not be a fact witness. Moreover,
insofar as her purported fact testimony pertains to the
question of the authenticity of the Cusack Papers, it is
addressed to the typewritten portions of those docu-
ments, *i.e.*, the subject of the 20/20 program.

Plaintiffs also have submitted two affidavits of Mar-
cel B. Matley. Mr. Matley, a forensic graphologist, criti-
cizes the trial testimony of Dillon and of the Govern-
ment's other expert, Gus Robert Lesnevich, but he does
not purport to conclude either that any of the Docu-
ments is authentic, or that, if they are not, it was not
Cusack who forged them.

[8] This was only one of several forms of proof by
which the Government persuaded the jury that Cusack
was guilty of the crimes with which he was charged.
*See*, Sentencing Opinion, at 6.

*S Inc.*

on to
time,
plain-
lefen-
ly, let

hat he
t the
xam-
l him
ncert

ize a
ation
a de-
ort."
[19

rea-
ng li-
erty/
: and
ll be

d —
ence
eous
r in-
h of
leal-
t 6),
ion-
con-
s in
349
of
alse
tion
ham
flic-
ous
ous
just
iffs'
ther
and
to
ons
of
in-

be-
ave
idi-
de-
ier,

plaintiffs' alleged damages were caused by Cusack's fabrication of the documents. Even had the *60 Minutes* Program criticized the ABC *20/20* broadcast, and even had it reported that it appeared that the Documents were authentic, the indictment and the subsequent conviction of Cusack would have brought about exactly the harm that plaintiffs claim to have suffered.

Moreover, there are independent reasons to grant defendants summary judgment as to the first, fourth and seventh through twelfth causes of action, as well as those branches of their fifth and sixth causes of action, that are alleged against White, Hersh and Dillon.

Plaintiffs' count one alleging fraud fails as it is well settled that a cause of action for fraud does not arise where, as here, the only fraud alleged merely relates to a party's intent to breach a promise. See, *Caniglia v. Chicago Tribune-New York News Syndicate*, 204 A.D.2d 233 (1st Dep't 1994).

That branch of plaintiffs' count four, alleging interference with contractual relations, fails because plaintiffs have failed to allege the terms of any contract that defendants may have interfered with.

That branch of count four that alleges interference with economic advantage fails to state a cause of action as plaintiffs do not contend that "defendants were motivated solely by malice or effected the interference by unlawful means." *Matter of Pamilla v. Hospital for Special Surgery*, 223 A.D.2d 508, 509 (1st Dep't 1996). On the contrary, plaintiffs acknowledge that the CBS defendants "were at least partially motivated by their own self interest" *(Id.* at 509) in preparing the news broadcast.

Plaintiffs' breach of contract claim against White is predicated on White's repudiation of his earlier authentications of a number of the Documents. Plaintiffs contend, that "[s]uch authentications constitute contracts by White which he cannot walk away from." Plaintiffs further contend that White's consideration was the opportunity to obtain a list of potential buyers of items from his own collection.

However, plaintiffs do not dispute White's averment that he never asked for, and never received, a list of the purchasers of those Documents that he had authenticated. Moreover, even assuming that there was a contract between White and Cloud or Cusack, plaintiffs fail to explain how that contract could have required that White authenticate any Document (as distinguished from giving his opinion as to its authenticity) or how White's

change of mind as to the authenticity of the Documents can constitute a breach of such contract. Finally, contrary to plaintiffs' contention, White did not deny on the Program that he had previously stated that certain of the Documents were genuine.

Similarly, plaintiffs' breach of contract claim against Hersh rests on their theory that Hersh's agreement to refrain from using the Documents for any purpose other than as material for his forthcoming book and/or from disclosing the source of the Documents, required Hersh to use the Documents even after he concluded that they had been fabricated, or barred him from disclosing his view that they had been fabricated. It is abundantly clear, however, that the intent of the parties was no more than to insure that if Hersh used the Documents, he would give due credit to Cusack and Cloud who, because of the publicity that Hersh's book was expected to garner, would be able to sell the Documents at greater prices than they could receive absent such publicity.

Plaintiffs also allege that Hersh did, in fact, use the Documents, albeit without authentication. Hersh avers, however, that "once it became apparent that the Documents were forged, I not only stopped work on the draft chapter making reference to the Documents from the book I was writing, but I also took steps to assure that none of the rest of my work was based on the Documents." Plaintiffs offer no evidence in admissible form to dispute this claim, but assert instead that they need to depose Hersh. However, plaintiffs have not demonstrated why such a need cannot be met by reference to Hersh's book.

Plaintiffs' breach of contract claim against Dillon fails because no contract between Dillon and any plaintiff is alleged.

Plaintiffs' claim alleging breach of the covenant of fair dealing (Count 6) fails as against Hersh, White and Dillon for the same reasons that plaintiffs' breach of contract claims against them must be dismissed.

Plaintiffs' breach of confidential and fiduciary relationship claim (Count 7) fails because plaintiffs have not alleged any facts showing a fiduciary relationship between any of them and the CBS defendants. The mere fact that those plaintiffs who co-operated with CBS expected the Program to be favorable to Cusack does not create a fiduciary relationship between those plaintiffs and CBS.

Plaintiffs' claims alleging violation of General Business Law §§ 349 and 350 (Counts 8 and 9) fail because those statutes pertain to

been reported to have had, can cause hypoglycemia.

Mr. Phillips, also a graphologist, states that he analyzed three of the Documents, and that his analysis "strongly suggests" that they were written by the same person who wrote documents known to have been written by President Kennedy. He also concludes that the writer of the three Documents may have been in poor health at the time that those documents were written.

Mr. Slatzer states that he was married briefly to Marilyn Monroe in 1952, and that they remained good friends until Ms. Monroe's death. He further contends that the references to Ms. Monroe in the Documents are historically accurate, and that they include information that, he believes, Cusack could not have known.

[3] Neither the hypothetical statements of Mr. Montano nor the inconclusive and speculative statements of Phillips and Slatzer suffice to raise a genuine dispute as to the truth of defendants' claims that the Documents were forged by Cusack.[9]

Nor have plaintiffs shown that defendants acted in a grossly irresponsible manner. By plaintiffs' own account, defendants Hersh and White initially believed the Cusack Papers to be authentic, and the CBS defendants believed that the *20/20* broadcast had exemplified bad journalism. Defendant Hersh, however, had come to believe that the Documents had been fabricated, and the Program correctly reported that he had concluded that he could not rely upon them. Defendant White, who is not and has never claimed to be a forensic graphologist, retracted his earlier endorsement of certain of the Documents upon learning that Dillon had concluded that the handwriting that appeared upon them had been forged.[10]

Although plaintiffs contend that CBS should not have relied upon an expert who had been recommended by the Postal Service, Cusack had not yet been indicted at the time that CBS retained Dillon. Moreover, plaintiffs

have not shown that CBS had any reason to think that Dillon might, at some future time, be a witness against Cusack. In short, plaintiffs have failed to show that the CBS defendants, Hersh or White acted irresponsibly, let alone in a grossly irresponsible manner.

As for Dillon, plaintiffs do not claim that he acted irresponsibly in concluding that the handwriting on the Documents that he examined was forged. Rather, they seek to hold him liable "on the basis that he acted in concert with the other CBS defendants."

However, New York does not recognize a tort of conspiracy to libel. "[T]he allegation of conspiracy is allowed only to connect a defendant to an otherwise cognizable tort." *McGill v. Parker,* 179 A.D.2d 98, 105 [19 Med.L.Rptr. 2170] (1st Dep't 1992).

For the foregoing reasons (and for the reason given below), plaintiffs' claims alleging libel and trade libel/disparagement of property/libel affecting value of property (counts 2 and 3 of the Second Amended Complaint) will be dismissed.

## B. The Other 11 Causes of Action

Plaintiffs' causes of action alleging fraud — "fraudcast" journalism (count 1), interference with contractual relations and advantageous relations (count 4), breach of contract or inducing breach of contract (count 5), breach of implied covenant of good faith and fair dealing or inducing the breach thereof (count 6), breach of confidential and fiduciary relationship and breach of third-party beneficiary contract (count 7), deceptive business practices in violation of General Business Law § 349 (count 8), false advertising in violation of General Business Law § 350 (count 9), false designation of origin and unfair competition in violation of Section 47(a) of the Lanham Act (count 10), intentional or negligent infliction of emotional stress (count 11), malicious instigation or continuation of a frivolous grand jury investigation (count 12) and unjust enrichment (count 13) all rest on plaintiffs' contention that the CBS defendants (other than Dillon) falsely promised Cusack and Cloud that the Program would be "fair" to them. Plaintiffs contend that their reputations were consequently harmed and the value of the Documents in their possession was diminished.

[4] All of these causes of action fail because the damages that plaintiffs claim to have suffered were not proximately, or even indirectly, caused by the actions that the CBS defendants are alleged to have taken. Rather,

---

[9] At Cusack's trial, the Government proved, *inter alia,* that the Cusack Papers included documents that had been stolen from Cusack's father's files, from the New York County Surrogate's Court, and from the Archdiocese of New York, which had then been altered by the addition of handwriting.

[10] Plaintiffs contend that Dillon complained after the Program that his views had been misrepresented, but this contention is based upon a hearsay statement of Don Wolfe. Moreover, Dillon went on to become one of the Government's two handwriting experts who testified against Cusack at his trial.

commercial activity and "were never intended to encompass the type of editorial comment at issue herein and, indeed, could not constitutionally do so." *New York Public Interest Research Group, v. Insurance Information Institute,* 161 A.D.2d 204, 205 (1st Dep't 1990).

Similarly, plaintiffs' claim under the Lanham Act (Count 10) fails because that Act applies to false and misleading commercial speech and was not intended "to limit political speech, consumer or editorial comment, . . . , or other constitutionally protected material. . ." *Groden v. Random House,* 61 F.3d 1045, 1052 [23 Med.L.Rptr. 2203] (2nd Cir. 1995), quoting 135 Cong. Rec. H1217 (daily ed. April 13, 1989) (Statement of Rep. Kastenmeier).

Plaintiffs' claim for intentional infliction of emotional distress (Count 11) must fail as defendants' alleged conduct is not " '. . . so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community' (citation omitted)." *Howell v. New York Post Co.,* 81 N.Y.2d 115, 122 [21 Med.L.Rptr. 1273] (1993).

Similarly, that branch of Count 11 alleging negligent infliction of emotional distress must fail, as the Court of Appeals has held that "there is no duty to protect from emotional injury a bystander to whom there is otherwise owed no duty, and, even as to a participant to whom a duty is owed, such injury is compensable only when a direct, rather than [as alleged here] a consequential, result of the breach." *Kennedy v. McKesson Co.,* 58 N.Y.2d 500, 506 (1983).

### Plaintiffs' Cross-Motion for a Stay

Plaintiffs' cross-motion and supplemental application for a stay of this action pending a determination of plaintiff Cusack's petition in federal court for a new trial is denied as the interests of justice demand a resolution of this lawsuit.

Accordingly, it is hereby

ORDERED that plaintiffs' cross-motion is granted to the extent that the executed copy of Cusack's affidavit is deemed to have been timely served and filed, and the cross-motion is otherwise denied; and it is further

ORDERED that the motion by defendants *60 Minutes* Division of CBS, Inc., Don Hewitt, Ed Bradley, Michael Radutzky, Jonathan H. Wells and Duayne J. Dillon for summary judgment is granted and the complaint against

them is dismissed with prejudice; and it is further

ORDERED that the application by defendant Robert L. White for summary judgment is granted and the complaint against him is dismissed with prejudice; and it is further

ORDERED that the motion by defendant Seymour M. Hersh for summary judgment is granted and the complaint against him is dismissed with prejudice; and it is further

ORDERED that the Clerk is directed to enter judgment accordingly.

This constitutes the decision and order of this Court.

---

## McMullen v. Denver Post Corp.

**Colorado District Court
City and County of Denver**

JOHN J. McMULLEN v. THE DENVER POST CORPORATION, d/b/a THE DENVER POST, and WOODY PAIGE

No. 00CV3759

May 24, 2001

### REGULATION OF MEDIA CONTENT

[1] Defamation — Libel per se (§ 11.01)

  Standard of liability — Actual malice (§ 11.3002)

  Privacy — Common law right — False light publicity (§ 13.0104)

Newspaper defendants are granted summary judgment dismissing libel claim stemming from sports column concerning purchase of NHL franchise in which it was stated that plaintiff, professional sports franchise owner and unsuccessful bidder of franchise at issue in article, had "left considerable unpaid debts" after purchasing another NHL franchise, even though defendants admit that statement was false, since plaintiff is public figure and article concerned matter of public interest, and since there is no evidence that article was published with actual malice, even though author of article relied on faulty memory in making statement; plaintiff's claim for false light invasion of privacy is also dismissed, since column was directed at plaintiff's public persona, not his private life.

---

Libel p
vacy actic
both parti
Plaintif
denied. I
judgment
Sean R
of Hogan
tiff.
Thoma
of Faegre

**Martin,**

Plainti
has asser
vasion o
column
lished in
on April
Stan Ma
umn wa
bidder fo
basketba
they pla
passage
John Mo

McM
who
Denv
of 19
Not o
run li
sider

The sol
tion is:
paid de

Mr. I
his for
1974, I
profess
agemei
access
contac
record
ferenc
has ad
poses
franch

In 1
Rockie
sional
the re
and h
franch
losses
conse

# Appendix 2:

# <u>Doe I v. Individuals</u>

Westlaw.

--- F.Supp.2d ----                                                                                      Page 2
--- F.Supp.2d ----, 2008 WL 2428206 (D.Conn.)
**2008 WL 2428206 (D.Conn.)**

CDoe I v. Individuals
D.Conn.,2008.
Only the Westlaw citation is currently available.
United States District Court,D. Connecticut.
DOE I, and Doe II, Plaintiffs,
v.
INDIVIDUALS, whose true names are unknown,
Defendants.
**Civil Action No. 3:07 cv 909(CFD).**

June 13, 2008.

Ashok Ramani, Benjamin W. Berkowitz, Dorothy
McLaughlin, Mark A. Lemley, Rose Darling, Steven
Mitra, Keker & Van Nest, LLP, San Francisco, CA,
David N. Rosen, David N. Rosen, Counselor at Law,
P.C ., New Haven, CT, for Plaintiffs.
John R. Williams, New Haven, CT, for Defendants.

***RULING ON DEFENDANT JOHN DOE 21'S
MOTION TO QUASH PLAINTIFF'S SUBPOENA
AND JOHN DOE 21'S MOTION TO PROCEED
ANONYMOUSLY***

CHRISTOPHER F. DRONEY, District Judge.
**\*1** On February 1, 2008, the plaintiffs, Jane Doe I
and Jane Doe II (the "Does") issued a subpoena
*duces tecum* to SBC Internet Services, Inc., now
known as AT & T Internet Services ("AT & T"), the
internet service provider, for information relating to
the identity of the person assigned to the Internet
Protocol ("IP") address from which an individual
using the pseudonym "AK47" posted comments on a
website. The individual whose internet account is
associated with the IP address at issue, referring to
himself as John Doe 21, [FN1] has moved to quash that
subpoena. John Doe 21 has also moved for
permission to proceed anonymously in this matter.

> FN1. Because John Doe 21 chose a male
> pseudonymous name to proceed under, the
> Court will refer to John Doe 21 using male
> pronouns. This does not reflect a finding by
> the Court that John Doe 21 is indeed male.

***I. Background***[FN2]

> FN2. The following facts are taken from the
> complaint and the exhibits submitted by the
> parties.

This action was brought by Doe I and Doe II, both
female students at Yale Law School, against
unknown individuals using thirty-nine different
pseudonymous names to post on a law school
admissions website named AutoAdmit.com
("AutoAdmit"). The plaintiffs allege that they were
the targets of defamatory, threatening, and harassing
statements posted on AutoAdmit from 2005 to 2007.

AutoAdmit is an internet discussion board on which
participants post and review comments and
information about undergraduate colleges, graduate
schools, and law schools. It draws between 800,000
and one million visitors per month. Anyone who can
access the internet can access AutoAdmit and view
the messages posted on its discussion boards.
Individuals who register with AutoAdmit, which can
be done under real or assumed names, may post new
messages and respond to the messages of other
registered users. When a participant posts a new
message, any further comments or responses to that
message are collected as a "thread." Messages and
threads containing certain words or subject matter
can be found by searching for those words using an
internet search engine.

The first message about Doe II that appeared on
AutoAdmit was posted on January 31, 2007, by an
anonymous poster. The message linked to a
photograph of Doe II and encouraged others to "Rate
this HUGE breasted cheerful big tit girl from YLS."
After this message was posted, dozens of additional
messages about Doe II appeared in the thread. These
messages contained comments on Doe II's breasts
and the posters' desire to engage in sexual relations
with her. Certain of the posters appeared to be Doe
II's classmates at Yale Law School because of
personal information they revealed. The posts
regarding Doe II continued throughout the winter and
spring of 2007, and included statements, for example,
that she fantasized about being raped by her father,
that she enjoyed having sex while family members
watched, that she encouraged others to punch her in
the stomach while seven months pregnant, that she

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
Page 3
--- F.Supp.2d ----, 2008 WL 2428206 (D.Conn.)
**2008 WL 2428206 (D.Conn.)**

had a <u>sexually transmitted disease</u>, that she had abused heroin, and that a poster "hope[s] she gets raped and dies."On March 9, 2007, a poster sent an email directly to Doe II and at least one member of the Yale Law School faculty describing the alleged criminal history of Doe II's father. This message was also posted on AutoAdmit.

**\*2** By March, nearly two hundred threads had been posted about Doe II on AutoAdmit. It is in this context that an anonymous poster under the moniker "AK47," known on AutoAdmit for posting threatening and derogatory comments about minority groups, posted a message falsely stating "Alex Atkind, Stephen Reynolds, [Doe II], and me: GAY LOVERS."

The posting of comments regarding Doe II continued into April and May of 2007, including one message which the poster claimed had also been sent to Doe II's future employer which recounted some of the claims made about Doe II on AutoAdmit. On June 8, 2007, Doe II, along with Doe I, filed the complaint in the instant action, alleging libel, invasion of privacy, negligent and intentional infliction of emotional distress, and copyright violations. Doe II's complaint described the harm and results she experienced because of the comments about her on AutoAdmit, including treatment for severe emotional distress, interference with her educational progress, reputational harm, and pecuniary harm.

The news of the filing of the Does' complaint quickly became a subject of discussion on AutoAdmit. AK47, for example, wrote a post concerning his opinion on the merits of the plaintiffs' case, and wondered whether posters were "allowed to use [Doe II's] name in thread's anymore."Subsequently, on June 17, 2007, AK47 posted the statement "Women named Jill and Doe II should be raped."On June 24, 2007, AK47 started a thread entitled "Inflicting emotional distress on cheerful girls named [Doe II]."

On February 1, 2008, the plaintiffs issued a subpoena *duces tecum* to AT & T for information relating to the identity of the person assigned to the IP address from which an individual using the pseudonym "AK47" posted comments on AutoAdmit about Doe II. This subpoena was issued in accordance with this Court's order of January 29, 2008, which granted the Does' motion to engage in limited, expedited

discovery to uncover the identities of the defendants in this case.[FN3]On February 7, 2008, AT & T sent a letter to the person whose internet account corresponded with the IP address at issue, John Doe 21 ("Doe 21"), notifying Doe 21 that it had received a subpoena ordering it to produce certain information relating to Doe 21's internet account. The letter stated that Doe 21 could file a motion to quash or for a protective order before the date of production, which was February 25, 2008, and that AT & T must receive a copy of such a motion prior to that date. Doe 21 filed the instant motion to quash on February 25, 2008, and on February 26, 2008, A & T complied with the subpoena.[FN4]On March 12, 2008, Doe 21 filed his motion to proceed anonymously.

> FN3. Notice of the application for the subpoena was posted on AutoAdmit on January 25, 2008.

> FN4. On February 25, 2008, the plaintiffs' counsel received a letter and a motion to quash signed by "John Doe 21, a.k.a. 'AK47.' " In the letter, Doe 21 admitted to posting the statement "Women named Jill and [Doe II] should be raped." Doe 21 also threatened to create a website on which he would track the pending litigation, detail the allegations, feature the actual names of the plaintiffs, and also solicit comments on whether the alleged comments on AutoAdmit were true. He also stated he would send links to this website to Yale and other university students, as well as posting a link on AutoAdmit. The ostensible purpose of such a website was to formulate his defense to this action, although he also admitted it would likely be harmful to the plaintiffs. Doe 21's letter stated he would not take such actions if he were dropped from the lawsuit.

Because Doe 21 does not have counsel and his true identity is yet unknown to the Court, the Court appointed pro bono counsel to represent the interests of Doe 21 at oral argument on the instant motions, which took place on May 5, 2008.

## II. Motion to Quash

### A. Threshold Issues

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 2428206 (D.Conn.)
**2008 WL 2428206 (D.Conn.)**

Page 4

*1. Subject Matter Jurisdiction*

**\*3** The basis for the plaintiffs' copyright claim, which is the only federal claim in the plaintiffs' complaint, is that one of the plaintiffs owns copyrights in her photographs, which are registered with the United States Copyright Office, and that these photographs were published without her permission on AutoAdmit.[FN5]

> FN5. In its complaint, the copyright claim is said to be by Doe I, but the plaintiffs' counsel has since indicated this was done in error, and the copyright claim is actually as to Doe II. Although the plaintiffs not yet amended their complaint, and the Court deems the complaint amended with the correct name for purposes of the current motions.

Pro bono counsel for Doe 21 suggested at oral argument and in supplemental papers that the Court lacks subject matter jurisdiction over the claims because the jurisdictional basis for a copyright claim is weak and "manufactured" for the purposes of this litigation. However, this Court has original jurisdiction over "all civil actions arising under the ... laws ... of the United States;"28 U.S.C. § 1331; and may exercise supplemental jurisdiction over state law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."28 U.S.C. § 1367(a). Thus, since the Court properly has jurisdiction over the copyright claim, which arises from the same case or controversy as the various state law tort and statutory claims, the Court also has subject matter jurisdiction as these state law claims, which arise from a "common nucleus of operative fact" namely, the alleged harassment of Doe I and Doe II on AutoAdmit.com and other web sites.[FN6]*See Promisel v. First Am. Artificial Flowers, Inc., 943 F.2d 251, 254 (2d Cir.1991).*

> FN6. The merits of the copyright claims have not been briefed, and the Court declines to dismiss the entire case because the federal claim might be "weak." The defendants, if they choose to appear, remain free to address the merits of the federal

claims.

*2. Mootness*

Doe II argues that the motion to quash is moot because the information sought has already been turned over to the plaintiffs by AT & T. However, the Court rejects this argument because the plaintiffs can be ordered to return the information and be prohibited from using it. *See Sony Music Entertainment Inc. v. Does 1-40, 326 F.Supp.2d 556, 561 (S.D.N.Y.2004).*

**B. Merits of the Motion to Quash**

A subpoena shall be quashed if it "requires disclosure of privileged or other protected matter and no exception or waiver applies."Fed.R.Civ.P. 45(c)(3)(A)(iii). Doe 21 moves to quash the subpoena because he claims disclosure of his identity would be a violation of his First Amendment right to engage in anonymous speech.

The First Amendment generally protects anonymous speech. *Buckley v. American Constitutional Law Found.,* 525 U.S. 182, 199-200 (1999) (invalidating statute requiring initiative petitioners to wear identification badges as violation First Amendment); *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 357 (1995) (overturning state statute that prohibited dissemination of campaign literature that did not list name and address of person issuing literature on First Amendment grounds); *Talley v. California,* 362 U.S. 60, 65 (invalidating statute that prohibited distribution of handbills without the name and address of preparer). The United States Supreme Court has also made clear that the First Amendment's protection extends to speech on the internet. *See Reno v. ACLU,* 521 U.S. 844, 870-71 (1997) (applying First Amendment analysis to online speech, noting "[t]hrough the use of chat rooms, any person with a phone line can become a town crier with a voice that resonates farther than it could from any soapbox. Through the use of Web pages, mail exploders and newsgroups, the same individual can become a pamphleteer."). Courts also recognize that anonymity is a particularly important component of Internet speech. "Internet anonymity facilitates the rich, diverse, and far ranging exchange of ideas [;] ... the constitutional rights of Internet users, including the First Amendment right to speak anonymously, must

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 2428206 (D.Conn.)
**2008 WL 2428206 (D.Conn.)**

be carefully safeguarded."*Doe v. 2 The Mart.com, Inc.,* 140 F.Supp.2d 1088, 1092, 1097 (W.D.Wash.2001). However, the right to speak anonymously, on the internet or otherwise, is not absolute and does not protect speech that otherwise would be unprotected. *See, e.g., McIntyre,* 514 U.S. at 353 ("We recognize that a State's enforcement interest might justify a more limited identification requirement."); *Harper & Row Publishers, Inc. v. Nation Enters.,* 471 U.S. 59, 555-56 (1985) (First Amendment does not protect copyright infringement); *In re Subpoena Duces Tecum to America On-Line, Inc.,* No. 40570, 2000 WL1210372, at *6 (Va.Cir.Ct.2000) ("Those who suffer damages as a result of tortious or other actionable communications on the Internet should be able to seek appropriate redress by preventing the wrongdoers from hiding behind an illusory shield of purported First Amendment rights.").

*4 Courts have held that subpoenas seeking information regarding anonymous individuals raise First Amendment concerns; *see NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 462 (1958) (holding that discovery order requiring NAACP to disclose its membership list violated First Amendment); and have addressed motions to quash subpoenas that, like the one at issue here, seek identifying subscriber information from ISPs. *See, e.g., Sony Music,* 326 F.Supp.2d at 567 ("[D]efendants' First Amendment right to remain anonymous must give way to plaintiffs' right to use the judicial process to pursue what appear to be meritorious copyright infringement claims").

The forgoing principles and decisions make clear that Doe 21 has a First Amendment right to anonymous Internet speech, but that the right is not absolute and must be weighed against Doe II's need for discovery to redress alleged wrongs. Courts have considered a number of factors in balancing these two competing interests. This balancing analysis ensures that the First Amendment rights of anonymous Internet speakers are not lost unnecessarily, and that plaintiffs do not use discovery to "harass, intimidate or silence critics in the public forum opportunities presented by the Internet."*Dendrite Intern. Inc. v. Doe No. 3, 775 A.2d 756, 771* (N.J.Super.2001). The Court will address each factor in turn.

First, the Court should consider whether the plaintiff has undertaken efforts to notify the anonymous posters that they are the subject of a subpoena and withheld action to afford the fictitiously named defendants a reasonable opportunity to file and serve opposition to the application. See *Krinsky v. Doe 6,* 159 Cal Rptr.3d 231 (Cal.App.2008); *Dendrite Intern. Inc. v. Doe No. 3, 775 A.2d 756, 760* (N.J.Super.2001). In this case, the plaintiffs have satisfied this factor by posting notice regarding the subpoenas on AutoAdmit in January of 2008, which allowed the posters ample time to respond, as evidenced by Doe 21's activity in this action.

Second, the Court should consider whether the plaintiff has identified and set forth the exact statements purportedly made by each anonymous poster that the plaintiff alleges constitutes actionable speech. *Dendrite,* 775 A.2d at 760. Doe II has identified the allegedly actionable statements by AK47/Doe 21: the first such statement is "Alex Atkind, Stephen Reynolds, [Doe II], and me: GAY LOVERS;" and the second such statement is " "Women named Jill and Doe II should be raped."The potential liability for at least the first statement is more fully discussed below.

The Court should also consider the specificity of the discovery request and whether there is an alternative means of obtaining the information called for in the subpoena. *Sony Music,* 326 F. Supp at 565;*Columbia Inc. v. SeesCandy.com,* 185 F.R.D. 573, 578, 580 (N.D.Cal.1999). Here, the subpoena sought, and AT & T provided, only the name, address, telephone number, and email address of the person believed to have posted defamatory or otherwise tortious content about Doe II on AutoAdmit, and is thus sufficiently specific. Furthermore, there are no other adequate means of obtaining the information because AT & T's subscriber data is the plaintiffs' only source regarding the identity of AK47.

*5 Similarly, the Court should consider whether there is a central need for the subpoenaed information to advance the plaintiffs' claims. *America Online, Inc.,* 2000 WL 1210372 at *7;*Dendrite,* 775 A.2d at 760-61. Here, clearly the defendant's identity is central to Doe II's pursuit of her claims against him.

Next, the Court should consider the subpoenaed party's expectation of privacy at the time the online material was posted. *Sony Music,* 326 F.Supp.2d at

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 2428206 (D.Conn.)
**2008 WL 2428206 (D.Conn.)**

566-67;*Verizon Internet Services,* 257 F.Supp.2d 244, 267-68 (D.D.C.2003), *rev'd on other grounds,*351 F.3d 1229 (D.C.Cir.2003). Doe 21's expectation of privacy here was minimal because AT & T's Internet Services Privacy Policy states, in pertinent part: "We may, where permitted or required by law, provide personal identifying information to third parties ... without your consent ... To comply with court orders, subpoenas, or other legal or regulatory requirements."Thus, Doe 21 has little expectation of privacy in using AT & T's service to engage in tortious conduct that would subject him to discovery under the federal rules.

Finally, and most importantly, the Court must consider whether the plaintiffs have made an adequate showing as to their claims against the anonymous defendant. Courts have differed on what constitutes such an adequate showing. Several courts have employed standards fairly deferential to the plaintiff, requiring that the plaintiff show a "good faith basis" to contend it may be the victim of conduct actionable in the jurisdiction where the suit was filed; *America Online,* 2000 WL 1213072, at *8; or to show that there is probable cause for a claim against the anonymous defendant; *La Societe Metro Cash & Carry France v. Time Warner Cable,* No. 030197400, 2003 WL 22962857, *7 (Conn.Super.2003). The Court finds these standards set the threshold for disclosure too low to adequately protect the First Amendment rights of anonymous defendants, and thus declines to follow these approaches.

Other courts have required that a plaintiff show its claims can withstand a motion to dismiss. *SeesCandy.com,* 185 F.R.D. at 579;*Lassa v. Rongstad,* 718 N.W.2d 673, 687 (Wis.2006). However, other courts have rejected this procedural label as potentially confusing because of the variations in the motion to dismiss standard in different jurisdictions. *See Krinsky,* 72 Cal Rptr. at 244. Similarly, but more burdensome, some courts have used a standard which required plaintiffs to show their claims could withstand a motion for summary judgment. *Best Western Intern., Inc. v. Doe,* No. CV-06-1537, 2006 WL 2091695, *4 (D.Ariz.2006); *Doe v. Cahill,* 884 A.2d 451, 461 (Del.Supr.2005). The Court finds this standard to be both potentially confusing and also difficult for a plaintiff to satisfy when she has been unable to

conduct any discovery at this juncture. Indeed, it would be impossible to meet this standard for any cause of action which required evidence within the control of the defendant.

**\*6** Several courts have required that a plaintiff make a concrete showing as to each element of a prima facie case against the defendant. *Highfields Capital Management L.P. v. Doe,* 385 F.Supp.2d 969, 976 (N.D.Cal.2005); *Sony Music,* 326 F.Supp.2d at 565;*Krinksy v. Doe 6,* 72 Cal.Rptr.3d at 245;*Dendrite,* 775 A.2d at 760-61. Under such a standard, "[w]hen there is a factual and legal basis for believing [actionable speech] has occurred, the writer's message will not be protected by the First Amendment."" *Krinsky,* 72 Cal Rptr. at 245. The Court finds such a standard strikes the most appropriate balance between the First Amendment rights of the defendant and the interest in the plaintiffs of pursuing their claims, ensuring that the plaintiff "is not merely seeking to harass or embarrass the speaker or stifle legitimate criticism."*Id.* at 244.

Doe II has presented evidence constituting a concrete showing as to each element of a prima facie case of libel against Doe 21. Libel is written defamation. To establish a prima facie case of defamation under Connecticut law, the Doe II must demonstrate that: (1) Doe 21 published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement.*Cweklinsky v. Mobil Chem. Co.,* 837 A.2d 759, 763-64 (Conn.2004), *citing QSP, Inc. v. Aetna Casualty & Surety Co.,* 773 A.2d 906, 916 (Conn.2001); 3 Restatement (Second), Torts § 558, 580B, at 155, 221-22 (1977); W. Prosser & W. Keeton, Torts (5th Ed.1984) § 113, at 802.

A defamatory statement is defined as a communication that tends to "harm the reputation of another as to lower him in the reputation of the community or to deter third persons from associating or dealing with him ..."*QSP, Inc,* 773 A.2d at 916 (internal quotation marks omitted). Doe II alleges, and has presented evidence tending to show that, AK47's statement, "Alex Atkind, Stephen Reynolds, [Doe II], and me: GAY LOVERS," is defamatory, because any discussion of Doe II's sexual behavior on

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 2428206 (D.Conn.)
2008 WL 2428206 (D.Conn.)

Page 7

the internet tends to lower her reputation in the community, particular in the case of any potential employers who might search for her name online.[FN7] In fact, in the similar context of slander (spoken defamation), any statement that imputes "serious sexual misconduct" to a person subjects the publisher to liability, without any need to prove the special harms required for other slanderous speech. *See* 3 Restatement (Second), Torts § 574, at 195-96.

> FN7. Context is relevant in determining the meaning of a statement. *See* 3 Restatement (Second), Torts § 563, at 163. Doe 21 suggests that the context in which the statements were made also shows that they were not defamatory, because AutoAdmit is well-known as a place for inane discussion and meaningless derogatory postings, such that one would not take such a statement seriously. However, not everyone who searched for Doe II's name on the internet, or who came across the postings on AutoAdmit, would be aware of the site's alleged reputation. Thus, Doe II has put forth sufficient evidence for a prima facie case of defamation.

Doe II has also alleged and presented evidence that Doe 21's statement clearly identified Doe II by name and was available to a large number of third persons (peers, colleagues, potential employers), whether they were on Autoadmit for their own purposes, or searched for Doe II via a search engine. Finally, Doe II has alleged and provided evidence that her reputation did suffer injury because of this comment. In her interviews with potential employers in the Fall of 2007, Doe II felt she needed to disclose that existence of this and other such comments on AutoAdmit and explain that she had been targeted by pseudonymous online posters. In addition, this statement has contributed to difficulties in Doe II's relationships with her family, friends, and classmates at Yale Law School.

**\*7** Thus, the plaintiff has shown sufficient evidence supporting a prima facie case for libel, and thus the balancing test of the plaintiff's interest in pursuing discovery in this case outweighs the defendant's First Amendment right to speak anonymously.[FN8] The defendant's motion to quash is denied.

> FN8. It is likely that Doe II has also presented a prima facie case for negligent or intentional infliction of emotional distress against Doe 21. However, because, unlike defamation, speech which inflicts emotional distress has not been specifically designated as unprotected by the First Amendment, the Court declines to use these causes of action as a basis for disclosure of Doe 21's identity.

### III. Defendant's Motion to Proceed Anonymously

Parties to a lawsuit must generally identify themselves. Fed.R.Civ.P. 10(a) (complaint must "include the names of all the parties"). This rule protects the public's legitimate interest in knowing all of the facts involved, including the identities of the parties. *K.D. v. City of Norwalk*, No. 3:06cv406, 2006 WL 1662905, at *1 (D.Conn.2006). Thus, "[c]ourts should not permit parties to proceed pseudonymously just to protect the parties' professional or economic life." *Doe v. United Services Life Ins. Co.*, 123 F.R.D. 437, 439 n. 1 (S.D.N.Y.1988). A party may proceed anonymously only after demonstrating "a substantial privacy right which outweighs the customary and constitutionally embedded presumption of openness in judicial proceedings." *K.D. v. City of Norwalk*, 2006 WL 1662905, at *1 (citing Fed.R.Civ.P. 10(a); *Doe v. Stegall*, 653 F.2d 180 (5th Cir.1981)).

Doe 21 has not made a showing of any substantial privacy right or of any potential physical or mental harm as a result of being a named party to this litigation. He argues that other named defendants have been subjected to ridicule on AutoAdmit or lost employment. However, even if Doe 21 could show he was likely to receive the same alleged treatment, which he has not, these harms are not the special harms required in order to proceed anonymously, but rather social stigma, embarrassment, and economic harm, none of which are grounds for proceeding anonymously. *See James v. Jacobson*, 6. F.3d 233, 238-39 (4th Cir.1993) (citing cases); *Frank*, 251 F.2d at 324; *Guerrilla Girls Inc. v. Kaz*, 224 F.R .D. 571, 573 (S.D.N.Y.2004). In addition, Doe 21's argument that he should be allowed to proceed anonymously because the plaintiffs have been allowed to do so is also without merit and irrelevant to the defendant's status.

Thus, the defendant's motion to proceed

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 2428206 (D.Conn.)
**2008 WL 2428206 (D.Conn.)**

Page 8

anonymously is denied.

*IV. Conclusion*

The motion of the defendant, identifying himself as Doe 21, to quash plaintiff's subpoena [Dkt. # 25] is DENIED. The defendant's motion to proceed anonymously [Dkt. # 28] is DENIED.

SO ORDERED.

D.Conn.,2008.
Doe I v. Individuals
--- F.Supp.2d ----, 2008 WL 2428206 (D.Conn.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# Appendix 3:

# <u>Foley v. CBS Broadcasting Inc.</u>

# SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT:  **MARCY S. FRIEDMAN**                    PART _17_
_____
*Justice*

M, Foley

INDEX NO. __108-103/06__

MOTION DATE _____

- v -

MOTION SEQ. NO. __002__

CBS

MOTION CAL. NO. _____

The following papers, numbered 1 to _____ were read on this motion to/for __dismiss__

|  | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | 1, 1a |
| Answering Affidavits — Exhibits | 2 |
| Replying Affidavits | |
| Memos of Law | M1, M2 |

**Cross-Motion:** ☐ Yes  ☑ **No**

Upon the foregoing papers, it is ordered that this motion

### DECIDED IN ACCORDANCE WITH ACCOMPANYING DECISION/ORDER.

**FILED**

SEP 20 2006

NEW YORK
COUNTY CLERK'S OFFICE

Dated: __9/13/06__                              Marcy _____ J.S.C.

**MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE FOR THE FOLLOWING REASON(S):**

Check one:  ☑ **FINAL DISPOSITION**   ☐ **NON-FINAL DISPOSITION**

Check if appropriate:  ☐ **DO NOT POST**   ☐ **REFERENCE**

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY - - PART 57

_____

MARY FOLEY and INGRID DOULET,                Index No.: 169463/05

                *Plaintiff(s),*

       *against*                                   DECISION/ORDER

CBS BROADCASTING, INC., and
ARNOLD DIAZ,

                *Defendant(s).*

                              Present: HON. MARCY FRIEDMAN
                                   Justice, Supreme Court

     In this action, plaintiff Mary Foley ("Foley") sues for defamation based on statements

made in three segments of a television news program, "Shame on U," broadcast by defendant

CBS Broadcasting, Inc. ("CBS") and reported by defendant Arnold Diaz ("Diaz"). In addition to

causes of action for defamation, the complaint also alleges intentional infliction of emotional

distress and tortious interference with prospective business relations. Defendants now move to

dismiss the amended complaint pursuant to CPLR 3211(a)(5) and (7) and 3211(g).

     The facts on which the complaint is based are largely undisputed: Plaintiff Mary Foley

operates a business that sells high end kitchen cabinets. In December 2003, CBS broadcast a

"Shame On U" segment ("December 2003 broadcast") in which Diaz reported that numerous

customers of Foley had made complaints against her. Several customers who were interviewed

on camera described their complaints, and they were asked by Diaz whether they felt "ripped off"

by Foley. In his introduction to the segment, Diaz stated that Foley had been "scamming

customers for years." Diaz also stated that several customers had taken her to court and won

judgments against her, and that one had obtained a restraining order against her. At the close of

the broadcast, Diaz stated that complaining customers were referred to the New York City

Consumer Affairs Department ("DCA"), which has "the power to take action against crooked

businesses." Foley alleges that she was defamed by statements made in the December 2003 broadcast that something "stinks" in her store, that she "scammed" customers, that cabinet manufacturing companies had "cut her off," and that she operated a "crooked" business.

In November 2004, another "Shame on U" segment was broadcast ("November 2004 broadcast") about Foley, focusing on DCA's closing of Foley's store. Diaz introduced this segment by stating that "con artist" Foley was furious when her cabinet showroom was padlocked by DCA. Diaz also reported that there were 20 outstanding complaints against Foley, and that DCA's closing of Foley's showroom was "a direct result" of defendants' prior broadcast about Foley's "scam." In the November 2004 broadcast, the DCA commissioner stated that DCA received many more complaints against Foley as a result of the December 2003 program, and that Foley owes customers and the city tens of thousands of dollars. In closing this segment, Diaz reported that Foley's store will remain padlocked until she resolves all customer complaints and pays fines owed to the City.

A third segment of "Shame on U" which focused on Foley was broadcast in June 2005 ("June 2005 broadcast"). This segment rebroadcast some material from the two earlier broadcasts, including footage of customers being asked if they were "ripped off" and showing the showroom being padlocked. In this third segment, Diaz reported that, according to the DCA commissioner, the padlocking was done to force Foley to settle 25 customer complaints against her. Diaz also reported that a "proposed deal" between Foley and DCA to resolve complaints against her had fallen apart, and that she failed to pay back money owed to her "victims." Diaz further reported that Foley was appealing "multiple decisions that have found her guilty of unlicensed home improvement activity."

-2-

As a threshold matter, defendants argue that the instant action is a "SLAPP" suit, or strategic lawsuit against public participation, as defined by Civil Rights Law § 76-a, and that the action should be dismissed pursuant to CPLR 3211(g). Civil Rights Law § 76-a (1)(a) defines a SLAPP suit as "an action, claim, cross claim or counterclaim for damages that is brought by a public applicant or permittee, and is materially related to any efforts of the defendant to report on, comment on, rule on, challenge or oppose such application or permission." "The anti-SLAPP provisions of Civil Rights Law § 70-a & § 76-a were enacted in 1992 to protect citizen activists from lawsuits commenced by well-financed public permit holders in retaliation for their public advocacy." (Guerrero v Carva, 10 AD3d 105, 116 [1st Dept 2004].) A finding that a lawsuit is a SLAPP suit imposes upon the plaintiff a heightened standard of proof to avoid dismissal of the action. (Id. See CPLR 3211[g].) However, "because the anti-SLAPP law is in derogation of common law, it must be narrowly construed. A narrow construction of the anti-SLAPP law requires that a SLAPP-suit defendant must directly challenge an application or permission in order to establish a cause of action under the Civil Rights Law." (Guerrero, 10 AD3d at 117.)

Here, defendants do not demonstrate that the instant action falls within the statutory definition of a SLAPP suit. Contrary to defendants' claim, it is not clear that plaintiff is a "public applicant" for purposes of the statute. There is no claim or evidence that at the time of defendants' first or second broadcasts, plaintiff was an applicant or permitee. "Defendants have not established that New York courts, as a matter of law, consider a plaintiff who has not applied for a permit * * * an 'applicant' for SLAPP purposes, simply because the opposing party (or anyone else) contends that the plaintiff should have applied for such an entitlement." (Yeshiva Chofetz Chaim Radin, Inc. v Village of New Hempstead, 98 F Supp 2d 347, 361 [SD NY

-3-

2000].See Hariri v Amper, NYLJ, June 30, 2006, at 24, col 1 [Sup Ct, NY County, Goodman, J.].)

Further, while plaintiff acknowledges that she completed an application for a home improvement contractor license which had not been approved as of the time of the third broadcast, none of the statements in the broadcasts "directly challenge" the application. Notwithstanding that the broadcasts reported on proceedings by the DCA against Foley, the broadcasts did not oppose, or comment on, a pending application before the DCA. The statements in the broadcasts therefore do not fall within the narrow construction given to the anti-SLAPP law. (See Guerrero v Carva, 10 AD3d 105, supra.)

Moreover, defendants' use of the anti-SLAPP provisions in this case "appears to stand the purpose of the legislation on its head. Defendants have identified no pertinent fundamental right in which they engaged, or which was curtailed, by [Foley's] lawsuit. Defendants certainly were not engaging in their right to petition the government." (Yeshiva Chofetz Chaim Radin, Inc. 98 F Supp 2d at 360. Compare Duane Reade, Inc. v Clark, 2 Misc3d 1007[A] [Sup Ct, NY County 2004].) Nor do defendants claim that the instant lawsuit has interfered with their free speech rights. To the contrary, defendants have continued to broadcast their programs unimpeded by plaintiff's actions.

Defendants also move to dismiss Foley's defamation claim based on the December 2003 broadcast as barred by the statute of limitations. The statute of limitations for libel or slander claims in New York is one year. (CPLR 215 [3].). Although repetition of a defamatory statement in a later edition or broadcast may recommence the period of limitations (see Firth v State of New York, 98 NY2d 365 [2002]; Rinaldi v Viking Penguin, Inc., 52 NY2d 422 [1981]),

-4-

the alleged defamatory statements made in the December 2003 broadcast which form the basis

for plaintiff's third cause of action were not rebroadcast in later segments. The transcripts of the

broadcasts at issue show that the rebroadcast portions of the December 2003 broadcast included

interviews with customers and Diaz asking customers if they felt ripped off, which were not

alleged by plaintiff to be defamatory. As plaintiff commenced the instant action in or around

June 2005, the cause of action based on the December 2003 broadcast should be dismissed.

As to Foley's claims for defamation based on the November 2004 and June 2005

broadcasts, defendants move to dismiss these claims on the grounds that the statements at issue

are either non-actionable expressions of opinion or rhetorical hyberbole, or are protected as

substantially true and fair reports.

It is well settled that "expressions of an opinion 'false or not, libelous or not, are

constitutionally protected and may not be the subject of private damage actions'." (Steinhilber v

Alphonse, 68 NY2d 283, 286 [1986], quoting Rinaldi v Holt, Rinehart & Winston, 42 NY2d

369, 380, cert denied 434 US 969.) It is further settled that whether a statement expresses fact or

opinion is a question of law for the court. (Id. at 290.) The determination as to whether a

statement is fact or opinion must be based on "what the average person hearing or reading the

communication would take it to mean." (Id.) Thus, the dispositive inquiry is "whether a

reasonable [listener] * * * could have concluded that [the broadcast was] conveying facts about

plaintiff." (Gross v New York Times Co., 82 NY2d 146, 152 [1993]; 600 West 115th St. Corp. v

Von Gutfeld, 80 NY2d 130, 139 [1992].) The inquiry generally entails an examination of "(1)

whether the specific language in issue has a precise meaning which is readily understood; (2)

whether the statements are capable of being proven true or false; and (3) whether either the full

-5-

context of the communication in which the statement appears or the broader social context and

surrounding circumstances are such as to signal readers or listeners that what is being read or

heard is likely to be opinion, not fact." (Gross, 82 NY2d at 153 [internal quotation marks and

citations omitted].) The court must examine "the content of the whole communication as well as

its tone and its apparent purpose." (Steinhilber, 68 NY2d at 293. Accord Immuno AG, v Moor-

Jankowski, 77 NY2d 235, 254 [1991], cert denied 500 US 954.)

Further, "in determining whether a particular communication is actionable, [the courts]

continue to recognize and utilize the important distinction between a statement of opinion that

implies a basis in facts which are not disclosed to the reader or listener, and a statement of

opinion that is accompanied by a recitation of the facts on which it is based." (Gross, 82 NY2d

at 153 [internal citations omitted].) The latter are ordinarily not actionable because "a proffered

hypothesis that is offered after a full recitation of the facts on which it is based is readily

understood by the audience as conjecture." (Id. at 154.)

Applying these standards, the allegations of the complaint are insufficient to withstand

the instant motion to dismiss. The allegedly defamatory statements at issue in this case include

statements that Foley was a "con artist," that she engaged in a "scam," that she "ripped off" her

customers, and that she ran a "crooked" business. These statements were made in the context of

Shame on U broadcasts which featured customers complaining that Foley either failed to deliver

goods or delivered defective goods. The broadcasts also summarized DCA proceedings against

Foley. Viewing the statements against this "contextual background," the court concludes "that a

reasonable [viewer] would understand the statements defendant[s] made about plaintiff as mere

allegations to be investigated rather than as facts." (See Brian v Richardson, 87 NY2d 46, 53

[1995][emphasis in original].)  There was also no suggestion in the broadcasts that there were additional undisclosed facts on which the assertion that Foley was a "con artist" was based.  (See id at 54.)

To the extent that the complaint also bases plaintiff's defamation claim on allegations regarding the DCA proceedings, it is protected by the privilege for the "fair and true report" of an official proceeding.  (Civil Rights Law § 74; Freeze Right Refrig. & Air Conditioning Servs., Inc. v City of New York, 101 AD2d 175 [1ˢᵗ Dept 1984].).  At most, the broadcasts contained minor inaccuracies about the proceedings – for example, that the premises was padlocked not only because of violations for unlicensed activities but also because of consumer complaints.  Such inaccuracies did not deprive the broadcasts of the cloak of the privilege.  (See Freeze Right Refrig. 101 AD2d at 183.)

The first cause of action, insofar as it purports to allege tortious interference with prospective business, and the fifth cause of action, for intentional infliction of emotional distress, should be dismissed.  Plaintiffs fail to meet the pleading requirements for these claims. Plaintiffs' request for leave to amend the pleadings to correct any deficiencies is denied, as plaintiffs make no showing of merit and offer no proposed pleading amending these claims.

Defendants' motion accordingly is granted to the extent that it is

ORDERED that the complaint is dismissed and the Clerk is directed to enter judgment accordingly.

The constitutes the decision and order of the court.

**FILED**

SEP 2 0 2006

NEW YORK
COUNTY CLERK'S OFFICE

Dated: New York, New York
September 13, 2006

MARCY FRIEDMAN, J.S.C.

-7-

# Appendix 4:

# <u>In re Ottinger v. The Journal News</u>

SUPREME COURT OF THE STATE OF NEW YORK
IAS PART COUNTY OF WESTCHESTER

FILED
AND
ENTERED
ON 7-1 2008

To commence the statutory time
period of appeals as of right
[CPLR 5513(a)], you are advised
to serve a copy of this order,
with notice of entry, upon all
parties.

PRESENT: HON. RORY J. BELLANTONI,
                                        Justice

------------------------------------------X

IN THE MATTER OF THE APPLICATION PURSUANT TO CPLR 3102 OF:

RICHARD OTTINGER and JUNE OTTINGER,
                                        Petitioners,

        - against -

NON-PARTY THE JOURNAL NEWS, A DIVISION OF GANNETT          INDEX NO: 08-03892
SATELLITE INFORMATION NETWORK, INC.
                                        Respondent.

------------------------------------------X

        The instant action was commenced by the filing of a summons and complaint on

February 25, 2008. The complaint alleges that certain defamatory statements were made

concerning Richard Ottinger and June Ottinger, which statements were posted on a "LoHUD"

blog hosted by the New York Journal News. The defendants named in that action were John

Doe 1-100 and Jane Doe 1-100.

In the complaint, plaintiffs set forth several statements by certain anonymous persons posted on the LoHUD blog. Those statements include the following:

"It now appears that it has been proven, that the Ottinger's, . . . have presented a FRAUDULENT deed in order to claim that they own land under water. . . . We are talking about the Ottingers LYING to the State, the Building Department, the ZBA and necessarily either bribing or coercing other people to do the same." (Posted September 11, 2007 by SAVE10543.)

"Equally outrageous, was that as Ms. McCrory was informing the dumbstruck BOT of the Ottingers criminal behavior . . . and advocated for the Ottinger's position in order to further their illegal scam." (Posted September 15, 2007 by hadenough.)

"He [the mayor of Mamaroneck] took the juice from Richard and June Ottinger to the tune of $25,000 so they could build their starter Taj Mahal on a substandard lot. Their money bought a compliant ZBA and Building Inspector. . ." (Posted September 19, 2007 by aoxomoxoa.)

THEY PAID THE RIGHT PEOPLE OFF! They started with taking care of the Mayor, everybody knows that. I would guess the Building Inspector and Zoning Board were not forgotten in their largesse. The Ottingers have been very generous in greasing the wheels of corruption. With the news of the fraudulent deed they submitted it becomes quite clear that they also must have taken care of the surveyor and the prior owner of the property, unless they are two of the dumbest people on earth! (Posted September 23, 2007 by SAVE10543.)

In an effort to ascertain the names of the anonymous bloggers, plaintiffs served a subpoena on The Journal News on February 28, 2008.

On March 21, 2008, The Journal News made a CPLR §2304 motion to quash the subpoena. On April 11, 2008, plaintiffs cross-moved to compel pursuant to CPLR R.3124 or, in the alternative, to convert the instant action to a special proceeding pursuant to CPLR §103(c) and allow pre-action disclosure pursuant to CPLR §3102(c).

-2-

On May 28, 2008, this court held a hearing regarding the pending motions. Upon stipulation of the parties, it was ordered that the instant action be converted to a special proceeding allowing plaintiffs (now petitioners) to seek pre-action disclosure pursuant to CPLR §3102(c).

The internet is creating emerging legal issues, from jurisdiction to discovery. The identification of anonymous bloggers–posting defamatory statements on the internet–is one of those issues. There is no question that the First Amendment protects the right of a person to speak anonymously. That protection, however, is no greater than the right of a person to speak when their identity is known. Anonymous speech is not absolute and does not provide a safe haven for defamatory speech.

The New York Court of Appeals and Appellate Divisions have not yet addressed this issue. The only reported decision in New York is from the Supreme Court New York County (*Greenbaum v. Google, Inc.*, 18 Misc.3d 185 [2007]). That case, however, failed to set a standard because the court found, as a matter of law, that the statements made were not defamatory.

The parties have urged this court to consider persuasive authority from other jurisdictions, specifically the Superior Court of New Jersey, Appellate Division decision in *Dendrite International v. Doe* (775 A.2d 756 [2001]) and the Delaware Supreme Court decision in *Doe v. Cahill* (884 A2d 451 [2005]). The court finds both decisions helpful in reaching a decision in this matter.

In *Dendrite* the Superior Court of New Jersey, Appellate Division established four guidelines in deciding applications for expedited discovery and compelling an internet service

-3-

provider to disclose the identity of anonymous internet posters who are sued for allegedly violating the rights of individuals or corporations:

> [T]he trial court should first require the plaintiff to undertake efforts to notify the anonymous posters that they are the subject of a subpoena or application for an order of disclosure, and withhold action to afford the fictitiously-named defendants a reasonable opportunity to file and serve opposition to the application. These notification efforts should include posting a message of notification of the identity discovery request to the anonymous user on the ISP's pertinent message board;

> The court shall also require the plaintiff to identify and set forth the exact statements purportedly made by each anonymous poster that plaintiff alleges constitutes actionable speech;

> The complaint and all information provided to the court should be carefully reviewed to determine whether plaintiff has set forth a prima facie cause of action against the fictitiously-named defendants. In addition to establishing that its action can withstand a motion to dismiss . . . the plaintiff must produce sufficient evidence supporting each element of its cause of action, on a prima facie basis; and

> The court must balance the defendant's First Amendment right of anonymous free speech against the strength of the prima facie case presented and the necessity for the disclosure of the anonymous defendant's identity to allow the plaintiff properly to proceed.

At the hearing on May 28, 2008, the court applied the first step in *Dendrite*.

The court reserved its decision on the pending motions and directed the petitioners to undertaken certain steps specified by the court to post a notification on certain Forums making known (a) the existence of the special proceeding, (b) the relief sought herein, and (c) the fact that any individual who believed that his or her rights might be affected could seek to intervene anonymously or otherwise in the special proceeding to appear on June 25, 2008. The notice was timely posted on the Forums in compliance with the direction of the court. On June 25, 2008,

-4-

the court held a further hearing on the matter on pending motions. At that time, no individual sought to intervene.

At this point the court finds that the petitioners in this matter have identified and set forth the exact alleged defamatory statements made by each anonymous poster. The complaint and all information provided to the court establishes that petitioners have set forth a prima facie cause of action against the fictitiously-named defendants. Petitioners have produced sufficient evidence supporting each element of its cause of action, on a prima facie basis, except that of constitutional malice.

With regards to constitutional malice, the court finds The Delaware Supreme Court *Doe v. Cahill* (884 A2d 451 [2005]) helpful. In *Cahill*, the Delaware Supreme court held a plaintiff must produce evidence on all elements of a defamation claim within the plaintiff's control. The constitutional malice element is not within a plaintiff's control. As the Delaware court pointed out,

> we are mindful that public figures in a defamation case must prove that the defendant made the statements with actual malice. Without discovery of the defendant's identity, satisfying this element may be difficult, if not impossible. Consequently, we do NOT hold that the public figure defamation plaintiff is required to produce evidence on this element of the claim.

(*Id.* at 464 [capitalization of "NOT" in original].) The court agrees and finds that the petitioners, at this point in the proceeding, need not prove this element to obtain pre-action disclosure.

Applying the fourth prong of *Dendrite*, the court finds that the balance in this case weighs in favor of the petitioners.

IT IS HEREBY ORDERED, that the motion of The Journal News is denied and the cross-motion of petitioners is granted as follows:

-5-

Within five business days of the date of this Order, The Journal News shall disclose to petitioners such information, if any, in its possession or control that could reasonably lead to the identification of the Anonymous Posters using the screen names "hadenough," "SAVE10543," and "aoxomoxoa," including posters' names, mailing addresses, any email addresses or other registration information that it may have for them including the IP address from which the blogs were posted, the corresponding internet service provider, other such information which will allow plaintiffs to identify the person(s) posting the blog entries.

6/27/08

Rory J. Bellantoni
A J.S.C.

-6-